[No. S085088. Mar. 29, 2001.]

FRIENDS OF SIERRA MADRE et al., Plaintiffs and Appellants, v. CITY OF SIERRA MADRE et al., Defendants and Appellants.

## COUNSEL

Brandt-Hawley & Zoia, Susan Brandt-Hawley and Rose M. Zoia for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Matthew Rodriguez and Theodora Berger, Assistant Attorneys General, Timothy R. Patterson and Christine Ann Sproul, Deputy Attorneys General, for State of California ex rel. Attorney General Bill Lockyer as Amicus Curiae on behalf of Plaintiffs and Appellants.

Rosenthal & Zimmerman and Deborah M. Rosenthal for California Preservation Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Michael H. Buhler and Elizabeth S. Merritt for National Trust for Historic Preservation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Antonio Rossmann and Roger B. Moore for Planning and Conservation League as Amicus Curiae on behalf of Plaintiffs and Appellants.

Stuart M. Flashman; Christopher Schlies; Howie, Long, LaForce & Smith and Norman LaForce for Preserve Area Ridgelands Committee, Inc., and Citizens for Balanced Growth, Inc., as Amici Curiae on behalf of Plaintiffs and Appellants.

Charles Martin, City Attorney; Landels, Ripley & Diamond, Janine K. Massey, Donald Sobelman, Edward J. Heisel; Milberg Weiss Bershad Hynes & Lerach, Sanford Svetcov; Morrison & Foerster, Michael H. Zischke and Andrew B. Sabey for Defendants and Appellants.

Louise H. Renne, City Attorney (San Francisco), Ellen Forman, Chief Deputy City Attorney, Kate H. Stacy and Susan S. Cleveland, Deputy City Attorneys; Richards, Watson & Gershon, Craig A. Steele (Agoura Hills); Carol A. Korade, City Attorney (Alameda); Robert Zweben, City Attorney (Albany); William Galstan, City Attorney (Antioch); Pamela Albers, City Attorney (Avalon); Robert M. Sherfy, Assistant City Attorney (Bakersfield); Michael G. Colantuono, City Attorney (Barstow and Monrovia); Terry B. Stevenson, Assistant City Attorney (Burbank); William S. Smerdon, City Attorney (Calipatria); Ronald R. Ball, City Attorney (Carlsbad); Kenneth A. Wilson, City Attorney (Clearlake, Cloverdale and Healdsburg); Mark T. Boehme, City Attorney (Concord); Harriet Steiner, City Attorney (Davis); Alan J. Peake, City Attorney (Delano and Wasco); Robert R. Wellington, City Attorney (Del Rey Oaks and Marina); Lynn R. McDougal, City Attorney (El Cajon and Imperial Beach); Brad L. Fuller, City Attorney (Eureka); Scott H. Howard, City Attorney (Glendale); John Truxaw, City Attorney (Half Moon Bay and Sonoma); Michael J. O'Toole, City Attorney (Hayward); Julie Biggs, City Attorney (Hemet); Elaine M. Cass, City Attorney (Hollister); Gail Hutton, City Attorney (Huntington Beach); Charles J. Williams, City Attorney (Lafayette); John Sanford Todd, City Attorney (Lakewood); Susan Burns Cochran, City Attorney (Lathrop); William W. Wynder, City Attorney (Lawndale); Randall A. Hays, City Attorney (Lodi); Sharon D. Stuart, City Attorney (Lompoc); Robert E. Shannon, City Attorney (Long Beach), Heather A. Mahood, Assistant City Attorney; Dave Larsen, Town Attorney (Loomis); Robert K. Booth, Jr. (Los Altos); Steven F. Nord, City Attorney (Merced); Steven T. Mattas, City Attorney (Milpitas and South San Francisco); William B. Conners, City Attorney (Monterey); Anthony Canzoneri, City Attorney (Monterey Park); Robert D. Herrick, City Attorney (Moreno Valley); Michael D. Martello, City Attorney (Mountain View); Thomas B. Brown, City Attorney (Napa); James R. Anderson, City Attorney (Nevada City); Gary T. Galliano, City Attorney (Newark and Union City); Duane E. Bennett (Oceanside); David A. De Berry, City Attorney (Orange); Gary L. Gillig, City Attorney (Oxnard); David J. Erwin,

City Attorney (Palm Desert); George S. Peyton, Jr., City Attorney (Piedmont); Debra S. Margolis, City Attorney (Pleasant Hill); Michael H. Roush, City Attorney (Pleasanton); Michael F. Dean, City Attorney (Plymouth); Daniel J. McHugh, City Attorney (Redlands); Robert A. Owen, City Attorney (Rialto); Thomas H. Terpstra, City Attorney (Ripon); Betsy Strauss, City Attorney (Rohnert Park); Mark Doane, City Attorney (Roseville); Hadden Roth, City Attorney (Ross and San Anselmo); Samuel L. Jackson, City Attorney (Sacramento); James C. Sanchez, City Attorney (Salinas); Jonathan Lowell, City Attorney (San Bruno); Robert J. Lanzone, City Attorney (San Carlos); Casey Gwinn, City Attorney (San Diego), Leslie J. Girard, Assistant City Attorney; Jeffrey G. Jorgensen, City Attorney (San Luis Obispo); Roy C. Abrams, City Attorney (San Mateo); Brian M. Libow, City Attorney (San Pablo); Gary T. Ragghianti, City Attorney (San Rafael); Daniel J. Wallace, City Attorney (Santa Barbara); Michael R. Downey, City Attorney (Santa Clara); Marsha Jones Moutric, City Attorney (Santa Monica); Phillip H. Romney, City Attorney (Santa Paula); Richard K. Denhalter, City Attorney (Stockton); Bradley W. Sullivan, City Attorney (Sutter Creek); Ann R. Danforth, City Attorney (Tiburon); Debra E. Corbett, City Attorney (Tracy); J. Dennis Crabb, City Attorney (Truckee); Scott Nichols, City Attorney (Walnut); and William E. Gnass, City Attorney (Waterford) for City and County of San Francisco, 86 California Cities and the California State Association of Counties as Amici Curiae on behalf of Defendants and Appellants.

Nicholas J. Cammarota for California Building Industry Association as Amicus Curiae on behalf of Defendants and Appellants.

David C. Smith for Building Industry Legal Defense Foundation as Amicus Curiae on behalf of Defendants and Appellants.

Cassidy, Shimko & Dawson, Anna C. Shimko and Matthew D. Francois for California Building Industry Association, California Business Properties Association and Building Industry Legal Defense Foundation as Amici Curiae on behalf of Defendants and Appellants.

**OPINION**

**BAXTER, J.**—This case presents an issue important to local governments and those interested in historic preservation: whether an initiative ballot

measure, generated by a city council rather than by voter petition, submitting to the voters an ordinance that removes a structure or structures from historic preservation status, is a project subject to the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).[1] We conclude that CEQA compliance is required when a project is proposed and placed on the ballot by a public agency. In so doing we reject defendants' argument that the trial court and, by implication, the appellate court, should not consider plaintiffs' claim that the results of the election at which the ordinance in dispute was adopted must be set aside because their challenge is not one permitted by Elections Code section 16100.

The Court of Appeal rejected the argument of the City of Sierra Madre that a postelection challenge to a local ordinance may not be made on grounds other than those specified by statute, concluding that it was free to address the merits of a claim that the ballot measure in issue here, City of Sierra Madre Ordinance No. I-97-1 (Ordinance No. I-97-1), was invalid because the city had not complied with CEQA before placing the measure on the ballot as a city-council-generated initiative.

We conclude that the judgment of the Court of Appeal affirming the order granting a peremptory writ of mandate should be affirmed. Although CEQA noncompliance is not among the statutory bases for an election contest (Elec. Code, § 16100) and those bases are exclusive if the claim is an election contest, mandate is a remedy authorized by CEQA to review and set aside a public agency action taken without CEQA compliance. Because we conclude that the discretionary submission of a ballot measure to the voters by a city council is not exempt from CEQA and the petition alleges, the record demonstrates, and the city acknowledges noncompliance, the invalidity of the ordinance was established. The trial court properly granted the petition for writ of mandate, albeit for the wrong reason. We, therefore, affirm the judgment of the Court of Appeal.

---

[1] The parties have assumed that the removal of buildings from a list of historic properties ("delisting") would constitute a "project" within the meaning of CEQA. (See Cal. Code Regs., tit. 14, § 15378, subd. (b)(3).) At oral argument before this court the city conceded that it had not preserved the issue for appellate review. Therefore, although the Court of Appeal addressed that question and this court requested briefing on it, we also assume arguendo, without expressing any view, that delisting is a project.

I

*Background*

The City of Sierra Madre enacted an historic preservation ordinance in 1987.[2] That ordinance created a Cultural Heritage Commission (CHC) with responsibility for identifying structures of historic or cultural merit and carrying out procedures to list on the city's Register of Historic Landmarks those structures worthy of preservation.[3] The ordinance also created a regulatory scheme applicable to listed properties.[4] The ordinance was repealed in July 1997 and replaced by a new ordinance (Sierra Madre Ord. No.

---

[2]The factual background has been gleaned from what the parties term an "Administrative Record." That record is, in fact, a record of the proceedings before the Sierra Madre City Council and joint proceedings before both the city council and other agencies, with copies of various ordinances, proposed ordinances, ballot materials, etc. None of those proceedings was an adjudicative hearing.

Although the petition for writ of mandamus states that it was brought pursuant to Code of Civil Procedure sections 1085 and 1094.5, the administrative mandamus procedure authorized by the latter section is not applicable to the actions taken by the city council, which were legislative, not adjudicative. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566-568 [38 Cal.Rptr.2d 139, 888 P.2d 1268] [quasi-legislative action adopting regulations reviewable by traditional mandamus, not administrative mandamus].) The city council did not conduct "a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested" in the council. (Code Civ. Proc., § 1094.5, subd. (a).) Amendment or adoption of an ordinance is a legislative act. (*Fall River Wild Trout Foundation v. County of Shasta* (1999) 70 Cal.App.4th 482, 488 [82 Cal.Rptr.2d 705].) Even when a legislative body acts after proceedings that bear some indicia of quasi-judicial action, those proceedings do not affect the legislative character of the act. (*Sharpell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 230 [1 Cal.Rptr.2d 818].)

[3]The 1987 ordinance (Sierra Madre Ord. No. 1036) directed the CHC to "designate and implement the preservation not only of landmark structures, but the single-family dwelling character and mix of architectural styles in the community, as well as the natural features." The CHC was to "study and recommend to the City Council what kinds of landmarks, building, or monuments and historical districts should be designated as worthy of preservation, protection or enhancement and what special historical, cultural, social, scientific, architectural or aesthetic values are applicable to guide the City Council in selecting and preserving such landmarks for posterity." (*Ibid.*)

The criteria for designation as a landmark were: "1. The site of an event having significance to the City, state, or nation. [¶] 2. Identification with a person or persons who have made a significant contribution to the City, state or nation. [¶] 3. A quality example of architecture, or of a construction method, period, or style of significance. [¶] 4. An established neighborhood or district made up of structures whose presence and character have made a significant contribution to the history, development, and aesthetic quality of Sierra Madre. [¶] 5. Natural features with significant historical or aesthetic qualities." (Sierra Madre Mun. Code, art. II, ch. 5, former §§ 2442-2443.)

[4]The 1987 ordinance prohibited issuance of a permit for demolition, historically significant alteration or removal of any building, structure or site listed in the register of cultural landmarks unless the matter had been referred to the CHC except when immediate action was

1134) adding chapters 2.28 and 17.82 to the municipal code. Under the newly adopted chapters 2.28 and 17.82 of the Sierra Madre Municipal Code, future landmark designation became voluntary.

The 1997 ordinance established procedures by which the owner of an already listed property may seek delisting by application to the CHC, which is then required to conduct a public hearing and make a recommendation to the city council. The city council then determines whether the request should be granted. Granting an application to delist is required "if the finding can be made that the information relied upon by the [CHC] or the city council in making the designation is discovered to be false or substantially erroneous thus rendering the property without historic merit." (Sierra Madre Mun. Code, § 17.82.080, subd. A.) An owner may also seek a certificate of economic hardship, issuance of which may lead to delisting. If the owner establishes that the economic hardship caused by designation is disproportionate to the value of the property under landmark designation, after a public hearing the commission, based on criteria set forth in the ordinance,[5] recommends whether to grant or deny the application. The ordinance also provides that "[a]ny substantial adverse change to an historic landmark shall be subject to the provisions of the Municipal Code governing demolitions." (Sierra Madre Mun. Code, § 17.82.110.)

---

necessary in the interest of public health and safety. In nonemergency situations, the CHC had 30 days to object to issuance of a permit for those activities. If an objection was filed, issuance of a permit could be delayed for up to 90 days or, if necessary, 120 days. During that period the CHC, if approved by the city council, was to use its powers to attempt to preserve the cultural landmark. (Sierra Madre Mun. Code, art. II, ch. 5, former § 2443.)

If an owner of a landmark complied with the conditions specified in the ordinance, city fees for permit and plan checking were waived and the State Historical Building Code was the governing code. Those benefits were conditioned on maintaining the structure in reasonable condition, submission of plans for improvements to design, review by the CHC to ensure compliance with the Standards of the Secretary of the Interior, and recordation of a covenant requiring subsequent owners to abide by the conditions. (Sierra Madre Mun. Code, art. II, ch. 5, former § 2444.)

[5]The recommendation must be based on "one or more of the following findings: [¶] 1. Sale or lease of the property is impractical in comparison to holding the property; [¶] 2. Denial of the request will diminish the value of the property so as to leave substantially no value, or damage the owner unreasonably in comparison to benefits conferred on the community; [¶] 3. An adaptive reuse study has been satisfactorily conducted, and found that utilization of the property for other lawful uses is not feasible, or that it would not allow a reasonable rate of return to the owner; [¶] 4. A rehabilitation study has been satisfactorily conducted, and that it would not allow a reasonable rate of return to the owner; [¶] 5. All means have been explored to relieve possible economic disincentives to no avail, involving city-sponsored incentives as of rights, tax abatements, financial assistance, application of the SHBC, zoning variances, loans, grants or reimbursements; [¶] 6. The owner has made every possible effort to find a willing buyer for the property who would agree to restore the historic landmark and has not been able to find a buyer who would offer a purchase price which afforded the owner a reasonable rate of return." (Sierra Madre Mun. Code, § 17.82.100, subd. D.)

In August 1997, the city adopted an ordinance governing demolition (Sierra Madre Ord. No. 1142), adding section 15.04.115 to the municipal code. Pursuant to this ordinance applicants for demolition permits are required to submit plans for mitigation of adverse impacts the proposed demolition may cause, including, inter alia, historic preservation. Section 15.04.115, subdivision A of the municipal code defines demolition as "the alteration, reconstruction, or elimination of fifty percent (50%) or more, of the floor area or monetary value, of an existing structure." The demolition ordinance provides, however, that (1) the filing of any required reports is not "intended to vest any discretion (under CEQA or otherwise) in the Building Official to deny such application. Instead, at the end of the thirty (30) day period [for issuance of a permit] such permit shall be issued unless such issuance is contrary to any law or regulation applicable at that date" (*id.*, subd. H), and (2) "[t]he issuance of a demolition permit shall be considered a ministerial duty under the provisions of CEQA Section 15268." (*Id.*, subd. J.)[6]

After the 1997 landmark preservation ordinance was adopted, several owners of landmark properties in Sierra Madre, asserting that their properties had been listed in error, asked that their properties be delisted. The staff of the city's Department of Development Services advised the city council that case law required the preparation of an environmental impact report (EIR) assessing the impact of removing a landmark property from the Register of Historical Landmarks. At a November 18, 1997, special meeting of the city council and CHC, held to hear from the property owners, many owners expressed reluctance to share in the $2,500 per property cost of preparing the EIR. A suggestion was made that the decision on delisting be placed on the ballot as an initiative and/or referendum that would not be subject to CEQA requirements.

---

[6]The reference is apparently to section 15268 of title 14 of the California Code of Regulations, commonly known as the CEQA Guidelines. The CEQA Guidelines are those issued by the California Resources Agency pursuant to Public Resources Code section 21083 to assist agencies in implementing CEQA. They may be found at title 14 of the California Code of Regulations, section 15000 et seq. and are referred to hereafter as CEQA Guidelines or the Guidelines.

Guidelines section 15268 provides: "(a) Ministerial projects are exempt from the requirements of CEQA. The determination of what is 'ministerial' can most appropriately be made by the particular public agency involved based upon its analysis of its own laws, and each public agency should make such determination either as part of its implementing regulations or on a case-by-case basis. [¶] . . . [¶] (c) Each public agency should, in its implementing regulations or ordinances, provide an identification or itemization of its projects and actions which are deemed ministerial under the applicable laws and ordinances. [¶] (d) Where a project involves an approval that contains elements of both a ministerial action and a discretionary action, the project will be deemed to be discretionary and will be subject to the requirements of CEQA."

The issue became an agenda item for a November 25, 1997, meeting of the city council. A memorandum prepared by the Director of Development Services reviewed the background of the item, summarized the views expressed at the November 18, 1997, meeting, and referred to the suggestion that the question be submitted to the initiative/referendum process which was described as an attractive idea as that process was not subject to CEQA. At the meeting the Director of Development Services orally summarized the item, concluding with the staff recommendation that the city council explore an initiative or referendum alternative that would exempt delisting the properties from CEQA. After the city attorney explained in response to a council member's inquiry that the measure would be an initiative,[7] the council member, an attorney, suggested that the term "initiative" be used "because I think that if we make it a referendum, that usually means that we have already decided something. The key to making this work is this Council does not make the decision whether to delist." The motion was amended to use the term "initiative." The same member assured the council that those properties would still be subject to CEQA for any use that required discretionary approval. Members also noted that the property owners did not want to pay for EIR's and the city could not afford to do so, but there would not be a significant additional cost if the matter was placed on an upcoming municipal election ballot. Using the initiative to achieve the goal of delisting would satisfy the objectives of the council which wanted to accommodate the property owners.

On December 9, 1997, the city council approved putting a measure on the April 14, 1998, election ballot as an initiative proposed by the city council. If approved by the voters, the ballot measure would enact an ordinance removing the 29 historic landmarks from the Register of Historic Landmarks. That proposal became Ordinance No. I-97-1 on the April 14, 1998, ballot.

Section xyz of the measure would amend Sierra Madre Ordinances Nos. 1036 and 1134 by delisting the specified 29 properties.

---

[7]The city attorney then explained that the measure would be an initiative authorized by Elections Code section 9222.

Elections Code section 9222 provides: "The legislative body of the city may submit to the voters, without a petition therefor, a proposition for the repeal, amendment, or enactment of any ordinance, to be voted upon at any succeeding regular or special city election, and if the proposition submitted receives a majority of the votes cast on it at the election, the ordinance shall be repealed, amended, or enacted accordingly. A proposition may be submitted, or a special election may be called for the purpose of voting on a proposition, by ordinance or resolution."

In *Lee v. City of Lompoc* (1993) 14 Cal.App.4th 1515 [18 Cal.Rptr.2d 389] (*Lee*), the Court of Appeal had held that CEQA review was not necessary to put a zoning ordinance on the ballot for voter approval regardless of whether the measure was an initiative or a referendum inasmuch as the electorate was not a public agency within the meaning of CEQA.

Before the vote, public speakers objected to the procedure as inappropriate and one asserted that CEQA did apply to this method of delisting. Others criticized the wording of the ordinance and analysis on the ground that they did not alert the voters the CEQA regulations would still apply should any significant changes be made to the properties, and that they would continue to be subject to the zoning ordinance. It was also asserted that the ordinance was misleading in stating that the owners of the 29 properties had not approved the listing of their properties and in stating that the properties lacked historic value.

At the December 9, 1997, city council meeting, the chairperson of the CHC asserted that the initiative or referendum process might not free the properties from the CEQA EIR requirement and argued that the council had an obligation to consider the historic merit of each property. CHC also claimed that the statement provided to the voters did not properly state the purpose of the ordinance or describe the consequences of delisting, and did not warn that the properties would still be subject to CEQA. A property owner in attendance stated that the ordinance was not intended to determine if the 29 properties were historic. It was to fulfill a promise of the council that listing was to be voluntary and to save the city the cost of preparing an EIR. The city council adopted resolution No. 97-69, by means of which Ordinance No. I-97-1 was submitted to the voters.

On February 10, 1998, the city administrator reported to the city council on an agenda item that proposed to adopt, as Sierra Madre Ordinance No. 1151 (Ordinance No. 1151), an amendment to section xyz of Ordinance No. I-97-1 for clarification purposes, this amendment to be effective only if Ordinance No. I-97-1 were adopted. As amended, section xyz of Ordinance No. I-97-1 would read (with changes in the language italicized):

"Section xyz: the voters of the City do hereby de-list (de-designate) the following described properties from the effects of: 1) ordinances 1036 and 1134; 2) from the effects of *those portions of* the General Plan *which relate to historic preservation*; and 3) from the effects of any federal, state, or local regulation, guideline or other imposition *as a result of such properties having been listed as historic under ordinances 1036 and 1134*. Such de-listing shall not deprive the City Council of authority or jurisdiction to modify this Ordinance in the future."

At the February 10, 1998, city council meeting, proposed Ordinance No. 1151 was discussed. The city attorney advised that the ballot language of Ordinance No. I-97-1 could not be changed but the measure could be

amended prior to the election by Ordinance No. 1151, notwithstanding the mayor's concern that changing the language of that measure would make it moot. The mayor offered his view that changing the measure before it was passed would cause confusion. The city administrator advised that the staff recommended sending a mailer to all property owners clarifying the language. After public comment and more debate Ordinance No. 1151 was given its first approval by a unanimous voice vote of the city council.

Ordinance No. 1151 was adopted formally by the city council on February 24, 1998.

The city prepared and distributed to the voters a ballot pamphlet that included an "Impartial Analysis" of Ordinance No. I-97-1. The analysis explained that, if passed, the ordinance would delist 29 properties then on the Register of Historic Resources and Landmarks. It advised that the owners claimed that the properties were erroneously included, the reasons for those claims,[8] and the conclusions of the CHC that preservation of the properties was important in retaining the values and culture of the city, that the properties had been listed properly, and that the properties should be preserved. The analysis also explained that the city council had decided to let the electorate settle the issue. In a March 16, 1998, letter to registered voters, the city administrator advised that the purpose of the April 14, 1998, election was to select three council members and "to affirm or deny Ordinance No. I-97-1 relating to the removal of certain properties from Sierra Madre's official list of Historic Resources. Ordinance No. I-97-1 was adopted by resolution at the city council meeting of December 9, 1997." The letter also advised the voters of the council's action amending Ordinance No. I-97-1, the amendment being for clarification purposes and to take effect only if Ordinance No. I-97-1 was passed by the voters. Enclosed as attachments were copies of the city attorney's impartial analysis,[9] Ordinance No. 1151, Ordinance No. I-97-1, and arguments pro and con, with rebuttals. The argument in favor of the measure asserted that the 29 properties had been designated without analysis to assure that they met the criteria, the city had advised the owners that the listing was voluntary, and that the owners had

---

[8] The reasons given were: "a) that Ordinance 1036 was intended to be a voluntary ordinance as to which properties would be listed only with the consent of the respective owners. [¶] b) that the 29 properties listed above never gave their consent, never should have been included, and should in fairness be de-listed at this time. [¶] c) that the imposition of regulations regarding historic landmarks should be reserved only for those properties involving an obvious historic status, and should not be overused for non-historic or only marginally historic significance. [¶] d) that none of the 29 properties listed above have any real historic value, and should not be burdened with the regulations and limitation of landmark status."

[9] This document advised: "1. On April 14, 1998, a measure will appear on the ballot asking for approval or disapproval for the de-listing of 29 properties from the advantages and

been involuntarily subjected to regulation by the CHC for 10 years. Without explanation it concluded: "Vote 'Yes' on Ordinance 1-97-1. Save the tax payers approximately $72,000." The argument against the measure asserted that the ordinance could be amended only by a vote of the people and that Ordinance No. 1151 was an attempt to cure overly broad language of a poorly drafted measure. The argument also asserted that, contrary to the Impartial Analysis, the council had not studied whether the properties should remain on the list, but had deferred consideration pending adoption of the new historic preservation ordinance and thereafter, "[w]hen it became evident that removing the 29 properties from the existing register would require environmental review (CEQA), this proposition was used to take advantage of a claimed exemption from CEQA compliance."

At the April 14, 1998, election, Ordinance No. I-97-1 received an affirmative vote of 1,536, with 846 persons voting against it.

Friends of Sierra Madre and Margaret Buckner filed the instant action, a petition for writ of mandamus, in the Los Angeles County Superior Court on June 8, 1998. Both the City of Sierra Madre and the city council are named as respondents. Alleging that the initiative process had been used to delist the 29 properties solely to avoid environmental review of the consequences, plaintiffs sought to set aside and void the election and all approvals relevant to Ordinance No. I-97-1, alleging failure to comply with CEQA. The petition also alleged violation of the Elections Code on the ground that amending Ordinance No. I-97-1 to materially change its scope and intent in advance of

disadvantages of having been designated as Sierra Madre 'Historic Resources'. Please refer to your official ballot documents for further information.

"2. Said measure was placed on the ballot by our City Council without recommendation as to 'Yes' or 'No', because the City Council was unable after years of study to reach a decision as to whether said 29 properties should remain on the designation list or be removed.

"3. Since the measure was placed on the ballot, both the pro and con groups have voiced concern as to the possibility that the measure as presented could be misinterpreted to have a broader scope than was intended.

"4. Because it is now too late to officially change the ballot wording, in order to present to the electorate as clear a language as possible, the Council has adopted Ordinance 1151 clarifying the language of the ballot measure so that (if passed), the intent of the electorate will be unambiguous in its impact and will de-list 29 properties only from Ordinances 1036 and 1134 and 1) from those limited portions of the General Plan relating to such designation and 'Historic Resources', and 2) to the extent permissible from those federal and state regulations applicable to such 29 properties from having been so listed.

"5. If you wish to de-list the 29 properties from the historic preservation regulations imposed by Ordinances 1036 and Ord. 1134, vote 'YES'; if you wish to continue the imposition of historic regulations upon such 29 sites, vote 'No'!

"6. The vote either way does not preclude future action by the City Council in compliance with applicable laws with regard to any or all of the 29 properties."

submitting the measure to the voters and the attempt to amend it without a vote of the electorate were unauthorized.

In an answer to the petition, the city and the city council asserted that the petition failed to fully, fairly, and accurately describe the various proceedings leading up to the adoption of Ordinance No. I-97-1. They also asserted, among several affirmative defenses, that CEQA was not applicable to Ordinance No. I-97-1 or to the actions related thereto taken by the city and that there had been no violation of any law; specifically that neither Public Resources Code section 21167 nor Elections Code section 9295 had been violated.

Petitioners asserted in their opening trial brief that, while properties listed in the city's register of historic landmarks may not be significantly altered or demolished without review by the CHC, nonlisted properties are granted "ministerial over-the-counter demolition permits" under Sierra Madre Municipal Code section 15.04.115. With respect to the alleged Elections Code violation, they asserted that the election procedure and materials failed to comply with Elections Code sections 9280, 9281, 9282, and 9223.

Respondents contended, inter alia, that the city council had not approved Ordinance No. I-97-1, but had simply submitted it to the voters for ratification. Relying on section 15378, subdivision (b)(4) of the CEQA Guidelines, they argued that it was a measure submitted to the voters for approval and thus was not a project subject to CEQA. They also argued that petitioner misconstrued the demolition ordinance, which requires mitigation measures when the owner proposes to demolish a historical building and gives the city the power to evaluate the mitigation measures, and that the members of the city council and the owners of the delisted properties understood that demolition would be subject to CEQA review. The demolition ordinance required that notice of a request for a demolition permit be given to all members of the city council and city commissions. Section IV.C.2.i of the Guidelines for Implementing the California Environmental Quality Act for the City of Sierra Madre triggers CEQA review whenever a historic structure is affected. Moreover, petitioners had neither sought a preelection injunction nor initiated a proper election contest under Elections Code section 16100 and, assuming the action was a proper challenge, had not brought it within the 30 days permitted by Elections Code section 16401, subdivision (d).

Relying on the administrative record, on documents submitted as exhibits to the pleadings, and on matters of which judicial notice was taken, including a copy of the sample ballot, the trial court granted a peremptory writ of

mandate setting aside Ordinance No. I-97-1 and Ordinance No. 1151 on the ground that the procedures followed in placing it on the ballot, and notifying voters of its impact as amended by the city council, violated the Elections Code. The court explained in a statement of decision that the failure to print the amended text of Ordinance No. I-97-1 on the ballot or in the voter information portion of the same ballot violated Elections Code section 9280. Mailing a clarification to the voters did not substantially comply with that section, whose purpose is to alert voters to precisely what they are voting on, and might have confused rather than enlightened them.

The judgment recited that the petition was granted only as to the Elections Code violation and was denied as to the CEQA issues. "The sample ballot neither informed voters of precisely what they were voting on nor directed them to where they could find it, and the election was therefore fundamentally unfair."

The city and city council appealed from the judgment, except insofar as it denied relief on the CEQA claim. Petitioners filed a cross-appeal from the CEQA ruling.

## II

### *The Court of Appeal Judgment*

The Court of Appeal first concluded that the city had substantially complied with the Elections Code. It, too, rejected the argument that a challenge to ballot materials may be made only before the election, noting that several courts have considered such challenges postelection. (See *California Gillnetters Assn. v. Department of Fish & Game* (1995) 39 Cal.App.4th 1145, 1164 [46 Cal.Rptr.2d 338].) Then, relying on *Horwath v. City of East Palo Alto* (1989) 212 Cal.App.3d 766, 777-778 [261 Cal.Rptr. 108], it considered whether the deficiencies in the ballot measure affected the ability of the voters to make an informed choice.

*Horwath v. City of East Palo Alto, supra*, 212 Cal.App.3d at pages 777-778, held that due process mandates invalidation of a ballot measure only if "the materials, in light of other circumstances of the election, were so inaccurate or misleading as to prevent the voters from making informed choices. In conducting this inquiry courts should examine the extent of preelection publicity, canvassing and other informational activities, as well as the substance or content of such efforts. The ready availability of the text of the ordinance, or the official dissemination and content of other related materials, such as arguments for or against the measure, will also bear on

whether the statutory noncompliance rendered the election unfair. Finally, courts should take into account the materiality of the omission or other informational deficiency. Flaws striking at the very nature and purpose of the legislation are more serious than other, more ancillary matters."

After examining the ballot materials and the circumstances in which Ordinance No. I-97-1 had been placed on the Sierra Madre ballot, the Court of Appeal concluded that the purpose of the measure was clearly and unambiguously set forth in the ballot materials and that any informational deficiencies in the Impartial Analysis were ancillary to the main purpose of Ordinance No. I-97-1. There had been extensive public debate before the election, several public hearings, and the mailing of a sample ballot and a letter clearly explaining the purpose and intent of Ordinance No. I-97-1 and the reason for Ordinance No. 1151. There was no evidence in the record that the voters were confused or that the deficiencies alleged had affected the fundamental fairness of the election. Therefore, the violations of Elections Code section 9280 did not require invalidation of the measure on due process grounds.

The Court of Appeal then considered whether Ordinance No. I-97-1 should be invalidated because it was a project subject to CEQA requirements. The court concluded that delisting historic properties was a project within the meaning of CEQA because delisting led to a change in legal status removing the evidentiary presumption of Public Resources Code section 21084.1 that a listed structure is a historically or culturally significant resource and may, in Sierra Madre, remove the property from the jurisdiction of the CHC and the historic preservation ordinance, Sierra Madre Ordinance No. 1036. Although the city might still have the power to review the historical significance of the property when a demolition permit was sought, delisting might have the effect of removing the property from CEQA requirements for other types of use, for building permits for alteration, and for relocation of the property. Thus, delisting constituted a project with an effect that might cause a substantial adverse change in the significance of an historical resource.

The court also held that Ordinance No. I-97-1 was not exempt under CEQA Guidelines section 15378 as a ballot measure because, before placing it on the ballot, the city council itself had approved Ordinance No. I-97-1. The court reasoned that Guidelines section 15378 was a codification of *Stein v. City of Santa Monica* (1980) 110 Cal.App.3d 458 [168 Cal.Rptr. 39] (*Stein*), and was not intended to exempt situations that are distinguishable from *Stein*. *Stein* held only that placing a rent control charter amendment on

the ballot on petition of the voters, where the city did not engage in any other related matters or projects, was not a project subject to CEQA. Thus, the guideline exempting ballot measures from the CEQA EIR requirement applied only when the public agency acts solely in a ministerial manner to place a citizen-initiated measure on the ballot, or if the public agency has already undertaken CEQA review for a project and submits approval of the project to the voters.

The Court of Appeal held that when the city abandoned its existing procedures in response to the opposition of the owners of the 29 properties to paying for EIR's and turned instead to use of an initiative measure to accomplish delisting, it effectively exercised its discretion to approve the project. The delisting was a discretionary project subject to CEQA because the city could have exercised its discretion to follow a procedure in which delisting would have been allowed or denied on the basis of an EIR, but chose not to. (*Friends of Westwood, Inc. v. City of Los Angeles* (1987) 191 Cal.App.3d 259, 272 [235 Cal.Rptr. 788].) Having reached that conclusion, the Court of Appeal determined, as a matter of first impression, that the appropriate remedy for the CEQA violation was to set aside both the resolution placing Ordinance No. I-97-1 on the ballot and the election because failure to comply with CEQA made the election fundamentally unfair and affected the result.

### III

### *Discussion*

█ The City of Sierra Madre and its city council dispute the conclusion of the Court of Appeal that the council's decision to submit a ballot measure to delist the 29 properties was a project subject to CEQA, relying on CEQA Guideline section 15378, subdivision (b)(3), which exempts "[t]he submittal of proposals to a vote of the people" and an argument that the electorate is not a public agency subject to CEQA. They also contend that postelection action seeking to set aside the ordinance is not one authorized by Elections Code section 16100 and is not otherwise permitted since the constitutionality of the ordinance is not challenged.

A. *CEQA Compliance.*

1. *Overview of CEQA.*

An overview of the purpose and structure of CEQA is necessary to an analysis of the applicability of the EIR requirement of that law to the actions of the Sierra Madre City Council.

The purpose of CEQA is set out in two introductory sections, which state the Legislature's findings and intent in creating the law. (Pub. Resources Code, §§ 21000, 21001.)[10] While the law is directed primarily to ecological concerns and preservation of the environment, section 21001, subdivision (c)

---

[10]Public Resources Code section 21000, enacted in 1970, declares:

"The Legislature finds and declares as follows:

"(a) The maintenance of a quality environment for the people of this state now and in the future is a matter of statewide concern.

"(b) It is necessary to provide a high-quality environment that at all times is healthful and pleasing to the senses and intellect of man.

"(c) There is a need to understand the relationship between the maintenance of high-quality ecological systems and the general welfare of the people of the state, including their enjoyment of the natural resources of the state.

"(d) The capacity of the environment is limited, and it is the intent of the Legislature that the government of the state take immediate steps to identify any critical thresholds for the health and safety of the people of the state and take all coordinated actions necessary to prevent such thresholds being reached.

"(e) Every citizen has a responsibility to contribute to the preservation and enhancement of the environment.

"(f) The interrelationship of policies and practices in the management of natural resources and waste disposal requires systematic and concerted efforts by public and private interests to enhance environmental quality and to control environmental pollution.

"(g) It is the intent of the Legislature that all agencies of the state government which regulate activities of private individuals, corporations, and public agencies which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage, while providing a decent home and satisfying living environment for every Californian."

Public Resources Code section 21001, which establishes state policy engendered by those findings, made it clear, however, that CEQA is also concerned with the preservation of historic resources. That section provides:

"The Legislature further finds and declares that it is the policy of the state to:

"(a) Develop and maintain a high-quality environment now and in the future, and take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.

"(b) Take all action necessary to provide the people of this state with clean air and water, enjoyment of aesthetic, natural, scenic, and historic environmental qualities, and freedom from excessive noise.

"(c) Prevent the elimination of fish or wildlife species due to man's activities, insure that fish and wildlife populations do not drop below self-perpetuating levels, and preserve for future generations representations of all plant and animal communities and examples of the major periods of California history.

"(d) Ensure that the long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian, shall be the guiding criterion in public decisions.

"(e) Create and maintain conditions under which man and nature can exist in productive harmony to fulfill the social and economic requirements of present and future generations.

"(f) Require governmental agencies at all levels to develop standards and procedures necessary to protect environmental quality.

"(g) Require governmental agencies at all levels to consider qualitative factors as well as economic and technical factors and long-term benefits and costs, in addition to short-term benefits and costs and to consider alternatives to proposed actions affecting the environment."

declares it is also the policy of the state to "preserve . . . examples of the major periods of California history."

CEQA requirements and procedures are triggered by any proposed public or private project that is not exempted by statute. Those procedures are intended to ensure that public agencies identify any potential significant environmental impact of a proposed project and condition approval of that project on implementation of feasible mitigation measures that will avoid or substantially lessen the potential environmental impact. (Pub. Resources Code, § 21002.)

"Project" is defined for CEQA purposes as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following:

"(a) An activity directly undertaken by any public agency.

"(b) An activity undertaken by a person which is supported, in whole or in part through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.

"(c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.)

■ To achieve the objectives of CEQA, the Legislature has mandated the preparation and consideration of an EIR before any public agency approves a project that is not statutorily exempt[11] unless the lead agency[12] issues a negative declaration, i.e., a declaration that the proposed project will not have a significant effect on the environment. (Pub. Resources Code, §§ 21064, 21080.1, 21082.2.) The purpose of an EIR is to inform the agency and the public, in detail, about the effect the project is likely to have on the

---

[11]Construction of housing in urbanized areas is among the projects for which no EIR is required if specified statutory conditions are met. (Pub. Resources Code, § 21080.7.)

[12]" 'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (Pub. Resources Code, § 21067.)

environment and the ways available to minimize that impact. (Pub. Resources Code, § 21061.)[13] The Court of Appeal summarized the framework of CEQA in *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 999-1000 [165 Cal.Rptr. 514]: "The act provides a three-tiered structure to guide agencies: If a proposed project falls within a category exempt from the requirements of CEQA by administrative regulation, or if it is certain that the project will not have a significant effect upon the environment, no further agency evaluation is required. [Citations.] If there is a possibility that the project may have a significant environmental effect, the agency must conduct an initial threshold study. [Citation.] If the initial study reveals that the project will not have such effect, the lead agency may complete a negative declaration briefly describing the reasons supporting this determination. [Citations.] However, if the project may have a significant effect on the environment, an EIR must be prepared. [Citations.]" (Fn. omitted.)

When the lead agency determines that an EIR is necessary,[14] it must notify all other responsible agencies which must, in turn, specify to the lead agency the scope and content of the EIR that is germane to that agency's area of responsibility. (Pub. Resources Code, § 21080.4.) If the EIR identifies significant effects on the environment the lead agency may not approve the project unless it finds that changes have been made in the project to avoid these effects, or, if the mitigation measures or alternatives identified in the EIR are not feasible, there are overriding benefits that outweigh the impact on the environment. (Pub. Resources Code, § 21081.)

The CEQA requirements apply to discretionary projects carried out or approved by public agencies, including enacting and amending zoning ordinances, issuance of conditional use permits, and approving tentative subdivision maps (Pub. Resources Code, § 21080), but "[m]inisterial projects

---

[13]" 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (Pub. Resources Code, § 21060.5.)

[14]Public Resources Code section 21083 imposes on the Office of Planning and Research of the California Resources Agency the responsibility to develop, and the secretary of the agency to adopt, guidelines setting out the criteria under which agencies are to determine if a project may have a " 'significant effect on the environment.' " (*Ibid.*) Those criteria must require such a finding if:

"(a) A proposed project has the potential to degrade the quality of the environment, curtail the range of the environment, or to achieve short-term, to the disadvantage of long-term, environmental goals.

"(b) The possible effects of a project are individually limited but cumulatively considerable. As used in this subdivision, 'cumulatively considerable' means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects.

"(c) The environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly." (Pub. Resources Code, § 21083.)

proposed to be carried out or approved by public agencies" and those the agency rejects or disapproves are expressly exempted from CEQA. (*Id.,* subd. (b)(1) & (5).)

The applicability of CEQA to historic structures is made clear by Public Resources Code sections 5020.1, subdivision (j), 21084, and 21060.5. Section 5020.1, subdivision (j) states: " 'Historical resource' includes, but is not limited to, any object, building, structure, site, area, place, record, or manuscript which is historically or archaeologically significant, or is significant in the architectural, engineering, scientific, economic, agricultural, educational, social, political, military, or cultural annals of California." Section 21084 provides that the California Resources Agency guidelines may specify classes of projects that do not have a significant effect on the environment, but may not include among those projects, inter alia, historic buildings. "Environment" is defined in section 21060.5 as including "objects of historic or aesthetic significance."

Public Resources Code section 21084.1, which declares that "[a] project that may cause a substantial adverse change in the significance of an historical resource is a project that may have a significant effect on the environment," also provides: "Historical resources included in a local register of historical resources, . . . or deemed significant pursuant to criteria set forth in subdivision (g) of Section 5024.1, are presumed to be historically or culturally significant for purposes of this section, unless the preponderance of the evidence demonstrates that the resource is not historically or culturally significant. The fact that a resource is not listed in, or determined to be eligible for listing in, the California Register of Historical Resources, not included in a local register of historical resources, or not deemed significant pursuant to criteria set forth in subdivision (g) of Section 5024.1, shall not preclude a lead agency from determining whether the resource may be an historical resource for purposes of this section."

These statutory provisions are supplemented by the Guidelines.

2. *Is a public-agency-generated initiative exempt from CEQA under Guidelines section 15378, subdivision (b)(3)?*[15]

▇▇▇ Regardless of whether the city council had decided to delist the 29 properties before voting to place the initiative that became Ordinance

---

[15]The request of the City of Sierra Madre and city council, that the court take judicial notice of a proposed modification of the demolition ordinance to provide a 30-day delay in issuance of demolition permits to enable the city council to review all applicable ordinances and

No. I-97-1 on the ballot, that action was improper unless Guidelines section 15378, subdivision (b)(3) exempted the ballot measure from CEQA compliance.

Guidelines section 15378, subdivision (b)(3) (hereafter Guidelines section 15378(b)(3)) provides, inter alia: "Project does not include: [¶] . . . [¶] (3) The submittal of proposals to a vote of the people of the state or of a particular community. (*Stein* v. *City of Santa Monica*, (1980) 110 Cal. App. 3d 458)[.]"

■ In *Stein, supra,* 110 Cal.App.3d 458, the city placed an initiative charter amendment on the ballot without complying with CEQA. The Court of Appeal affirmed the denial of a petition for writ of mandate by which the petitioners sought to block implementation and enforcement of the amendment. The only issue was whether CEQA applied to an initiative charter amendment placed on the ballot in response to a petition signed by the requisite number of registered voters. Noting that California Constitution, article XI, section 3 and Government Code section 34450 required that such measures be submitted to the voters, the Court of Appeal held that this procedure for amending the city charter involved no discretionary activity by the city. Moreover, as the city acted only as the agent of the electorate, the proposal was not a project of a public agency. It was therefore a nondiscretionary activity not contemplated by CEQA. (*Stein, supra,* 110 Cal.App.3d at pp. 460-461.)

■ The Court of Appeal here distinguished *Stein* on the basis that Ordinance No. I-97-1 was not an initiative sponsored by members of the electorate that the city council was required to place on the ballot. It then concluded that Guidelines section 15378(b)(3) did not excuse the failure to comply with CEQA because the evidence in the record was sufficient to establish that the city council placed Ordinance No. I-97-1 on the ballot only after it had decided to delist the affected properties. That decision and the decision to place the measure on the ballot were discretionary, not ministerial. Therefore, placing the council-generated initiative measure on the ballot was not the type of ministerial act contemplated by the guideline.

regulations, is granted. In all other respects the requests of the city and city council for judicial notice are denied.

The request of the Attorney General that we take judicial notice of a document from the 1982 rulemaking file of the California Resources Agency entitled Summary of and Response to Comments, State CEQA Guidelines, Neumiller and Beardslee is granted. This document is relevant to the scope of Guidelines section 15378, subdivision (b)(3), formerly section 15378, subdivision (b)(4). The agency's responses to comments received in the rulemaking process must be included in its statement of reasons stating its intent in adopting a regulation (Gov. Code, § 11347.3) and thus constitutes part of the official statement of regulatory intent.

Although Guidelines section 15378(b)(3) makes no distinction between council-generated and voter-sponsored ballot measures and on its face appears to exempt all from CEQA, the Court of Appeal concluded that, by referring to the *Stein* decision, the California Resources Agency intended to "codify" *Stein, supra,* 110 Cal.App.3d 458, i.e., to limit the exemption to nondiscretionary ministerial actions that placed measures initiated by the citizenry on a ballot for approval by the electorate.

Amicus curiae State of California agrees that Guidelines section 15378(b)(3) is not intended to exempt all ballot measures from CEQA. In support of that view, the Attorney General relies on that part of the Summary of and Response to Comments document from the files of the California Resources Agency, prepared in conjunction with its 1982 rulemaking, of which we have taken judicial notice. (See fn. 15, *ante.*) This portion of the Summary of and Response to Comments addresses a proposal by a law firm to amend what was then Guidelines section 15378, subdivision (b)(4) (now § 15378(b)(3)) to cover any activity directed or authorized by a vote of the people. The firm suggested, e.g., that if by initiative the voters directed the city council to take all steps necessary to construct a wastewater treatment plant, CEQA should not apply to that project.

The comment on that proposal explained why the agency declined to expand the existing exemption. The first consideration was that when a citizen-sponsored initiative was placed on the ballot the city's decision to do so was purely ministerial. A second consideration was the inability to identify a lead agency. The groups sponsoring the initiative should not be burdened with the cost of an EIR. Third, CEQA should not prevent the people from voting on an issue.

The comment then explained the existing section: "Although we wished to exempt from CEQA the step of submitting an issue to the vote of the people, we did not see this provision as a complete exemption from CEQA for any project related to the vote of the people. We believed that if a public agency was required to take one or more discretionary actions concerning a project that was subject to the vote, then the public agency should comply with CEQA before taking its discretionary action."

A subsequent paragraph suggests, however, that the comment that the agency did not see the section "as a complete exemption from CEQA for any project related to the vote of the people" referred to actions subsequent to the vote. In the specific instance suggested by the law firm, the city would have discretionary power over the manner in which the project was carried out.

Nothing in this document clarifies whether the agency intended that the exemption from CEQA for ballot measures encompass initiatives generated by a public agency.

The addition of the citation of *Stein* to Guidelines section 15378(b)(3) is more indicative of the agency's intent with respect to initiative ballot measures, suggesting the agency intended that the exemption apply only in the *Stein* situation, i.e., when placing an initiative measure on the ballot was a ministerial act compelled by law.

We presume that the California Resources Agency intended that the Guidelines section 15378(b)(3) conform to section 21080, subdivision (b)(1), which expressly excepts "[m]inisterial projects proposed to be carried out or approved by public agencies," and, as *Stein* held, placing a voter-sponsored measure on the ballot is a ministerial act. Moreover, imposing CEQA requirements on such initiatives might well be an impermissible burden on the electors' constitutional power to legislate by initiative. (Cal. Const., art. II, §§ 8, 11.) We so held in the context of initiatives directed to the amendment of a general plan, the amendment of zoning ordinances, and the preservation of agricultural land, which were challenged for failure to comply with procedural prerequisites applicable to legislative bodies. (See *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 785-786 [38 Cal.Rptr.2d 699, 889 P.2d 1019], and cases cited.) We also noted in *DeVita* that Elections Code sections 9111 and 9112 permit, but do not require, a city or county to conduct an environmental impact study in conjunction with the placement of a voter-generated initiative on the ballot as long as that review does not interfere with prompt placement of the initiative on the ballot. (*DeVita, supra,* at p. 795.) There is therefore a clear distinction between voter-sponsored and city-council-generated initiatives.

We also presume, since an administrative regulation may not exceed the scope of authority granted by or be inconsistent with the statute pursuant to which it is promulgated (Gov. Code, §§ 11342.1, 11342.2; *Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 321 [87 Cal.Rptr.2d 423, 981 P.2d 52]), that the California Resources Agency did not intend to exempt from CEQA any project that might cause a significant adverse impact on the environment unless exemption is permitted by CEQA or mandated by other controlling law. The city argues that the court should defer to the expertise of the administrative agency in its construction of the statute (see *Dyna-Med v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1388-1389 [241 Cal.Rptr. 67, 743 P.2d 1323]), but offers no basis for its assumption that the Resources Agency intended to exempt initiatives generated by a public agency from CEQA. The citation to *Stein* suggests that it did not.

As the Attorney General suggests, the distinction between initiatives generated by a city council and voter-sponsored initiatives serves a significant governmental policy. Voters who are advised that an initiative has been placed on the ballot by the city council will assume that the city council has done so only after itself making a study and thoroughly considering the potential environmental impact of the measure. For that reason a preelection EIR should be prepared and considered by the city council before the council decides to place a council-generated initiative on the ballot. By contrast, voters have no reason to assume that the impact of a voter-sponsored initiative has been subjected to the same scrutiny and, therefore, will consider the potential environmental impacts more carefully in deciding whether to support or oppose the initiative.

Inasmuch as no law mandates or permits exclusion of ballot measures initiated by a public agency from CEQA, and as we presume the Resources Agency intended the guideline to be valid, we cannot accept the city's construction of the guideline as one that exempts from CEQA ballot measures placed before the electorate by a public agency in the exercise of the agency's discretion.[16]

The city relies in part on *Lee, supra,* 14 Cal.App.4th 1515, for its argument that the submission of this initiative to the electorate was exempt from CEQA. *Lee* is readily distinguishable. There the city council reached an impasse over the adoption of amendments to its general plan and zoning ordinance to facilitate a shopping center development. Before the stalemate occurred, an EIR had been prepared and considered by the city council. Thus, there may have been compliance with CEQA, a question the Court of

---

[16]We are unpersuaded by the city's argument that the city council was exercising only "procedural discretion" as to how delisting should be accomplished when it decided to place the measure on the ballot instead of itself amending the ordinance to delist the properties. In contrast to the constitutional and statutory obligation to place a properly qualified voter-sponsored initiative on the ballot, here the city council had discretion to do nothing, but opted instead to place the delisting ordinance on the ballot. None of the alternatives involved only a ministerial act. Nor do we agree that requiring CEQA compliance when a public agency places an initiative on the ballot burdens the people's right to legislate by initiative. Requiring CEQA compliance before placing a city-council-generated initiative on the ballot does no more than ensure that the electorate is informed of any potential substantial impact the measure could have on the environment. It does not affect the power of the people to adopt the initiative or their ability to themselves place the measure on the ballot by petition without CEQA compliance.

We also reject the city's argument that its discretionary action placing the delisting measure on the ballot did not require CEQA compliance because the voters are not a public agency. Assuming, as we do here, that delisting is a project, the project in question was that of the city council. It was that action that foreseeably, although indirectly, might have a substantial impact on the properties subject to the council-generated initiative.

Appeal did not decide because, relying on what was then Guidelines section 15378, subdivision (b)(4), now section 15378(b)(3), the court held that submitting the matter to the voters was not a project and therefore it was irrelevant whether a matter reached the voters by a city-council-generated initiative or a voter-sponsored petition. While we disagree with the latter conclusion, under the circumstances in which the *Lee* matter reached the ballot, the result may have been correct. An EIR had been prepared and was available to inform the voters and the impasse made it impossible for the council to act on the proposal before it. Notably, the *Lee* court did not consider whether as construed to exempt all matters submitted to the voters from CEQA, the guideline would be inconsistent with the legislative intent underlying CEQA.

Amici curiae City and County of San Francisco and others argue that requiring CEQA compliance for city-council-generated initiatives will handicap a city in responding to a voter-sponsored land use initiative by offering its own alternative because the process of CEQA compliance cannot be completed before the voter-sponsored initiative must be placed on the ballot. It is not within the province of the court to create exceptions to the CEQA mandate that discretionary projects that may have a substantial impact on the environment be subjected to CEQA review, however. And, as noted above, if a city or county believes the voter-sponsored initiative is ill-advised because it will have an adverse impact on the environment, it may refer the matter for an abbreviated environmental review pursuant to Elections Code sections 9111 and 9112. That review may then be made available to the voters. Contrary to the assertion of the City and County of San Francisco, mandatory CEQA review for city- or county-generated initiatives that may affect the environment need not silence the voices of cities and counties on controversial issues.

We conclude, therefore, that initiative measures generated and placed on the ballot by a public agency are not exempt from CEQA. Before placing any such measure that may lead to voter approval of a project on the ballot, the agency must comply with CEQA. If compliance leads to the preparation and consideration of an EIR, when that process is final the information contained in the EIR must be made available to the electorate for its consideration prior to the election.

B.  *Elections Code Issue.*

██  The City of Sierra Madre also contends that, because this challenge to the adoption of Ordinance No. I-97-1 does not allege that the measure is unconstitutional, a postelection challenge is not permitted by Elections Code

section 16100. As noted earlier, we agree that this action is not properly brought as an election contest. It is, however, a proper challenge to the validity of the ordinance itself and thus may be brought independent of the statutes governing election contests.

### 1. *Election contests.*

■ The purpose of an election contest is "to ascertain the will of the people at the polls, fairly, honestly and legally expressed." (*Garrison v. Rourke* (1948) 32 Cal.2d 430, 436 [196 P.2d 884], overruled on another point in *Keane v. Smith* (1971) 4 Cal.3d 932, 939 [95 Cal.Rptr. 197, 485 P.2d 261].) "Strict rules embodied in the Elections Code govern a court's review of a properly contested election. ' "It is a primary principle of law as applied to election contests that it is the duty of the court to validate the election if possible. That is to say, the election must be held valid unless plainly illegal. [Citations.]" ' (*Wilks* v. *Mouton* (1986) 42 Cal.3d 400, 404 [229 Cal.Rptr. 1, 722 P.2d 187].)" (*Gooch v. Hendrix* (1993) 5 Cal.4th 266, 277 [19 Cal.Rptr.2d 712, 851 P.2d 1321].) ■ Neither CEQA nor the Elections Code contains any provision suggesting that the court may invalidate an election because procedural prerequisites to a governmental action applicable to administrative agencies have not been complied with prior to placement of a measure on the ballot for decision by the voters. Such omissions are not illegalities recognized by the Elections Code. They do not affect the integrity of the election process that an election contest seeks to protect and preserve. ■ That the court's authority to invalidate an election is limited to the bases for contest specified in Elections Code section 16100 and that section is exclusive is strongly suggested by the nature of the grounds for contest therein enumerated. Apart from contests seeking a recount of ballots, all relate to conduct made unlawful by the Elections Code and all go to the integrity of the elections process.[17]

Elections Code section 16100 specifies the grounds for a contest of an election, providing: "Any elector of a county, city, or of any political subdivision of either may contest any election held therein, for any of the following causes:

"(a) That the precinct board or any member thereof was guilty of malconduct.

---

[17]The power of the court to invalidate a ballot measure on constitutional grounds is an exception to this limitation on election contest proceedings. (See *Canales v. City of Alviso* (1970) 3 Cal.3d 118, 131 [89 Cal.Rptr. 601, 474 P.2d 417].) Assertedly invalid statutes or ordinances may be challenged on constitutional grounds in an election contest, which leads to an order setting aside the result of the election, or on constitutional or other grounds by an action for declaratory relief or, where authorized, by a petition for writ of mandamus, each of which results in a judicial determination that the measure is invalid.

"(b) That the person who has been declared elected to an office was not, at the time of the election, eligible to that office.

"(c) That the defendant has given to any elector or member of a precinct board any bribe or reward, or has offered any bribe or reward for the purpose of procuring his election, or has committed any other offense against the elective franchise defined in Division 18 (commencing with Section 18000).

"(d) That illegal votes were cast.

"(e) That the precinct board in conducting the election or in canvassing the returns, made errors sufficient to change the result of the election as to any person who has been declared elected.

"(f) That there was an error in the vote-counting programs or summation of ballot counts."

This provision is accompanied by others, which specify the procedure to be followed in an election contest, including the filing, by an elector who contests the result, of a written statement which sets forth "specifically" the "particular grounds of contest and the section of [the] code under which the statement is filed." (Elec. Code, § 16400.) The requirement that the person contesting an election specify the section of the Elections Code under which the contest statement is filed also suggests that the grounds for contest specified in that code are exclusive.

The Court of Appeal assumed that the grounds for an election contest set out in former section 20021 (now section 16100) of the Elections Code were exclusive in *Long v. Hultberg* (1972) 27 Cal.App.3d 606 [103 Cal.Rptr. 19]. There a preelection attempt was made to keep a recall petition off the ballot on the ground that the petitions were insufficient. Before the Court of Appeal could decide an appeal from the trial court's order denying the petition for writ of mandate, the election was held. The Court of Appeal dismissed the appeal as moot, noting as it did so that the petition's insufficiency was not grounds for an election contest under former section 20021 of the Elections Code (now section 16100). More recently, in *Horwath v. City of East Palo Alto, supra*, 212 Cal.App.3d 766, the court reached the same conclusion, holding that the requirement that there be an impartial analysis of a ballot measure applied only to preelection activities. A failure of the city attorney to comply with the requirement was not a basis for a postelection contest in which the petitioners contended that the process of enacting a ballot measure was so "infected by official misinformation" that the legislation should be invalidated. The Court of Appeal explained: "The

election contest provisions set forth in [former Elections Code] section 20021 et seq. allow an elector of a given city or county to challenge an election held therein on six specified grounds. The main purpose of these provisions is to 'ascertain the will of the people and to make certain that mistake or fraud has not frustrated the public volition.' (*Enterprise Residents etc. Committee* v. *Brennan* (1978) 22 Cal.3d 767, 774 [151 Cal.Rptr. 1, 587 P.2d 658].) Courts have applied these provisions to candidates as well as ballot measure elections, and to special as well as general elections. [Citations.] But they confine their inquiry to the matters prescribed in the provisions enumerating the grounds of contest. [Citations.]" (*Horwath v. City of East Palo Alto, supra,* 212 Cal.App.3d at pp. 773-774, fn. omitted.)

In *Williams v. McClellan* (1953) 119 Cal.App.2d 138 [259 P.2d 12], one of the decisions on which the *Horwath* court relied, the court had held that a complaint that did not allege any of the enumerated bases for an election contest did not state a cause of action. "If we assume [the] plaintiffs are attempting to contest the election . . . they have failed to set forth therein any of the causes for such a contest as provided in [former] section 8511 of the Elections Code. . . . [¶] . . . [¶] The prayer of plaintiffs' complaint is for injunctive relief to restrain the defendants from performing further administrative or ministerial acts by virtue of the incorporation election. The complaint does not state facts sufficient to constitute a cause of action . . . ." (*Williams, supra,* 119 Cal.App.2d at pp. 143-144.) This court reached the same conclusion under an earlier elections law. "The proceeding may be instituted by any elector. The only matters of inquiry for the court are those prescribed in subdivisions 1, 2, 3, and 4 of [former] section 1111 of the Code of Civil Procedure . . . ." (*Maddux v. Walthall* (1903) 141 Cal. 412, 415 [74 P. 1026].) Plaintiffs have not offered any basis for a conclusion that the Legislature intended to change that limitation on election contests and the court's authority to set aside an election when the Elections Code was enacted in 1939 or in any subsequent amendment of that code. Section 2 of the Elections Code now states, as did its predecessor, that insofar as the provisions of the code are substantially the same as their preexisting counterparts they "shall be construed as restatements and continuations, and not as new enactments."

■ We agree therefore that this action is not a permissible election challenge.

2. *Validity of Ordinance No. I-97-1.*

Although this action was not properly brought as an election contest, the use of a petition for writ of mandate is a proper procedure by which to

challenge the validity of a statute or ordinance enacted without compliance with CEQA. (See *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151 [217 Cal.Rptr. 893].)

Judicial review of CEQA-related actions of public agencies is authorized by Public Resources Code sections 21167, 21168, and 21168.5. Section 21167 refers to "[a]ny action or proceeding to attack, review, set aside, void, or annul the [specified] acts or decisions of a public agency on the grounds of noncompliance with this division." Section 21168 also refers to "[a]ny action or proceeding" as does section 21168.5. Neither these sections nor any of the related provisions governing judicial actions in CEQA expressly authorize review by petition for writ of mandate.

However, Public Resources Code section 21168.9 authorizes issuance of mandamus to void actions taken without compliance with CEQA, by providing that the order be made "by the issuance of a peremptory writ of mandate." Public Resources Code section 21168.6 also provides that mandate issue only from this court in actions under Public Resources Code sections 21168 and 21168.5 against the Public Utilities Commission. It is apparent, therefore, that the Legislature contemplates and has implicitly authorized use of a petition for writ of mandate as a means by which to review and annul public agency actions approving projects when the actions have been taken without compliance with CEQA. This is consistent with the traditional use of mandamus to correct an abuse of discretion by a board or agency and implements section 21005, which provides that "noncompliance with substantive requirements of this division, may constitute a prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5. . . ."

Public Resources Code section 21168.5 was first construed as authorizing use of a petition for writ of mandamus to invalidate a local ordinance adopted without compliance with CEQA shortly after CEQA was adopted. In *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68 [118 Cal.Rptr. 34, 529 P.2d 66], a petition for writ of mandamus was used to challenge the adoption by a city council of three ordinances. We held there that judicial review of the city's decision to adopt the ordinances without CEQA compliance was governed by section 21168.5 and that, because the city had not made the required CEQA determinations before the ordinances were adopted, the judgment of the superior court denying the petition which sought to invalidate the ordinances should be reversed.

We again recognized the propriety of this use of mandamus recently in *Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th 559, 568,

in which a quasi-legislative action—adoption of regulations—was in issue: "In determining whether to grant a petition for traditional mandamus on the ground that an administrative body failed to comply with CEQA in making a quasi-legislative decision, the court may consider only 'whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (Pub. Resources Code, § 21168.5.)"

That plaintiffs here sought to set aside the election is not relevant. In assessing the adequacy of a complaint to state a cause of action, it does not matter that the complaint seeks a type of relief to which the plaintiff is not entitled. (*Colvig v. RKO General, Inc.* (1965) 232 Cal.App.2d 56, 66 [42 Cal.Rptr. 473].) The same is true with respect to a petition for writ of mandamus. (Code Civ. Proc., § 1089.) Where a petitioner is not entitled to the relief sought, the court may grant appropriate relief. (See *Brown v. Superior Court* (1949) 34 Cal.2d 559, 566 [212 P.2d 878]; see also 8 Witkin, Cal. Procedure (4th ed. 1997) Extraordinary Writs, § 206, p. 997, and cases cited.)

Therefore, since Public Resources Code section 21168.5 authorizes use of a petition for writ of mandamus to set aside an action of a public agency for noncompliance with the provisions of CEQA, this petition is a procedurally proper means of challenging the validity of Ordinance No. I-97-1. Since the petition adequately alleges noncompliance, failure to comply is not disputed by respondents, and the record confirms noncompliance, the appropriate relief is invalidation of the ordinance.

## IV

### Disposition

The judgment of the Court of Appeal directing the trial court to grant the petition for writ of mandate on the CEQA violation claim is affirmed.

George, C. J., Mosk, J., Kennard, J., Werdegar, J., Chin, J., and Brown, J., concurred.

On May 2, 2001, the opinion was modified to read as printed above.