Filed 6/23/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAVE OUR ACCESS, | D080071 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2020-00030308-CU-TT-CTL) |
| CITY OF SAN DIEGO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine Bacal, Judge. Affirmed.

Mara W. Elliott, City Attorney, George F. Schaefer and M. Travis Phelps, Assistant City Attorneys, and Benjamin P. Syz, Deputy City Attorney, for Defendant and Appellant.

DeLano & DeLano and Everett L. DeLano III for Plaintiff and Respondent.

I.

INTRODUCTION

The City of San Diego (City) appeals a judgment entered in favor of Save Our Access[1] on its petition for writ of mandate challenging the City's approval of a 2020 ballot measure proposing amendments to the San Diego Municipal Code and a City ordinance to exclude the Midway-Pacific Highway Community Plan Area from the 30-foot height limit for construction of buildings within the City's Coastal Zone.

The superior court determined the City failed to comply with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.)[2] (CEQA) in approving the ballot measure because the administrative record did not support the City's claim that a 2018 program environmental impact report (PEIR) for the Midway-Pacific Highway Community Plan Update (CPU) considered the environmental impacts associated with excluding the area from the City's Coastal Zone height limit. The court also concluded the administrative record supported a fair argument that the ballot measure may have significant environmental impacts that were not previously examined. The court issued a writ of mandate directing the City to set aside its approvals of the ordinance that submitted the ballot measure to the voters and enjoined the City "from taking any steps to further the Project until lawful approval is obtained from the City."

_____

[1]    Save Our Access describes itself as "a non-profit corporation that seeks to support the quality of life in Southern California by advocating for public access to beaches, parks, water, and public land and for creating more parkland."

[2]    Further statutory references are to the Public Resources Code unless otherwise stated.

The City appeals, contending the superior court applied the wrong standard of review and that the administrative record shows its reliance on the 2018 PEIR complied with CEQA. We disagree and, therefore, affirm the judgment.[3]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Background of the Coastal Height Limit Overlay Zone*

In 1972, San Diego voters passed Proposition D (Ordinance No. 10960), stating, "no building or addition to a building shall be constructed with a height in excess of thirty feet within the Coastal Zone of the City of San Diego." The ordinance defined the Coastal Zone as "that land and water area of the City of San Diego from the northern city limits south to the border of the Republic of Mexico, extending seaward to the outer limit of city jurisdiction and extending inland to the location of Interstate [Highway] 5 on January 1, 1971," but excluding the downtown area. The Coastal Zone height limit is codified in the San Diego Municipal Code as section 132.0505.[4]

---

[3]  The superior court declined to take judicial notice of the results of the 2020 election on this measure since they were not before the City at the time it made its decision and were irrelevant to the court's analysis. The City subsequently approved a Supplemental Environmental Impact Report and prepared a second ballot measure to remove the Coastal Zone height limit in the Midway-Pacific Highway Community area unless we reverse the trial court's ruling. In supplemental briefing, both parties agreed that litigation is ongoing regarding that second ballot measure and the City's subsequent action does not moot the issues in this appeal. Therefore, we do not consider the City's actions after the court's judgment. Save Our Access's request for judicial notice filed June 17, 2022 is denied.

[4]  The San Diego International Sports Arena, which opened in 1966 and exists today, was 77 feet high. The 1972 ordinance prohibited construction of new structures in excess of 30 feet in the Coastal Zone.

The initiative petition circulated for Proposition D in 1972 stated its purpose was to " 'keep the beaches usable by all citizens and to preserve the nature of the coastal communities by preventing concrete high rise barriers that would, because of congestion, impede or prevent access to these areas.' In addition, the petition stated that the 30-foot height limit would 'provide a small measure of protection against unwanted high population density with its problems of congestion, lack of parking space, increased crime rate, noise, air pollution, inadequate public utilities and increased taxes.' "

The ballot summary arguments in favor of Proposition D stated a building height limit was necessary to guide future development to preserve "the unique and beautiful character of the coastal zone of San Diego." A list of reasons for a height limit included maintaining accessibility to beaches and "[h]igh-rise buildings obstruct needed ocean breezes, sky and sunshine." In response to opposition arguments that the initiative would allow "a solid wall of thirty foot high buildings," proponents argued "[e]xperience proves that solid walls of high-rise result without height limits."

Over the years, San Diego voters amended the ordinance several times to exclude areas from the Coastal Zone height limit, typically for a specific property or project. In 1988, voters approved an amendment providing an exception to allow historic restoration of a chimney and rooftop cupola of the 1915 Agar/Mission Brewery building at Washington and Hancock Streets. This existing building had housed one of the earliest businesses in the area and is designated as a local and national historical building.

Ten years later, in 1998, the voters approved an amendment allowing an exception for Sea World to plan and construct exhibits, attractions, and educational facilities under specific conditions. Among those conditions, the

4

amendment limited the height for such projects to one-half the height of the existing Sea World Sky Tower.

Voters amended the ordinance again in 2000 to exclude the International Gateway of the Americas project in San Ysidro from the height limit. This exception limited the amount of land that could be used for structures more than 30-feet high and provided additional height limits for specific areas within the planned development.

B.     *Historical Development of the Midway-Pacific Highway Community*

The Midway-Pacific Highway Community is "an urbanized community that encompasses approximately 1,324 acres, situated north of [d]owntown" consisting of "the relatively flat Midway area, the linear Pacific Highway corridor, and the Marine Corps Recruit Depot."

"The Midway-Pacific Community was historically an area of tidal marshes and flats where the San Diego River branched at the mouth of Mission Valley to flow into both San Diego Bay" and what is now Mission Bay. The Kumeyaay people traveled through the area between Point Loma and settlements in Old Town. Later, Spanish military and missionary parties followed the Kumeyaay trail (naming it the La Playa Trail) to connect the anchorage at La Playa to the Presidio and the Mission at Old Town.

The neighborhood played an important role in San Diego's growth and transformation during the late 19th century and early 20th century with transportation improvements and the development of military, aerospace, and related industries. Pacific Highway was one of the first paved roads in San Diego. After World War II, small warehouses and industrial buildings filled areas along the Pacific Highway corridor and commercial shopping centers arose to serve residents and visitors. In the 1960's, the community further developed to facilitate the movement of automobiles after the

construction of Interstate Highways 5 and 8.  Automobile-related businesses were attracted to the area as well as commercial and industrial businesses serving the military and the San Diego airport.  Commercial shopping centers developed to cater to "nearby residential, military, and visitor populations, as well as some multi-family housing development."

The San Diego International Sports Arena opened in 1966 for sporting and public events.  Restaurants opened nearby to feed the sports fans.

The first Midway Community Plan was adopted in 1970.  It was updated in 1991 to incorporate the Pacific Highway corridor.  Although "older retail centers . . . made aesthetic improvements since the 1990s, the predominant auto-oriented urban form . . . remained."  To attract new development, the community plan was amended in 1999 with a "Bay-to-Bay Canal" concept to develop residential, retail, employment uses, and recreational amenities along a proposed canal.  But when studies determined the canal concept was not feasible, the plan was amended again in 2006.

C.      *2018 Midway-Pacific Highway Community Plan Update*

In 2008, the City initiated a process to update the Midway-Pacific Highway Community Plan.  Between 2010 and 2017 "an extensive outreach program was undertaken to solicit input from residents, business owners, property owners, public officials, and other interested parties within the Midway-Pacific Highway CPU area."

The City issued a notice of preparation of a program environmental impact report (PEIR) for the community plan update in November 2015.  The scoping statement informed the public that the "Coastal Height Limit Overlay Zone . . . applies to the entire Midway-Pacific Highway community," which "limits construction of new development to 30-feet in height to protect coastal views."

6

In 2018, after nearly a ten-year process, the City Council approved the Midway-Pacific Highway Community Plan Update (CPU) and amendments to the general plan. The City Council also certified the PEIR for the CPU along with a statement of overriding considerations and a mitigation and monitoring report.

The final CPU "envisions a mix of land uses in Midway-Pacific Highway, organized into districts and villages to create distinct urban activity nodes. These nodes will be connected through a system [of] pedestrian- and bicycle-oriented streets that link to parks within the community and to the recreational amenities at Mission Bay, the San Diego River, and San Diego Bay." The CPU's land use goals included developing a "vibrant, balanced, and pedestrian-oriented community that provides residential, commercial, office, industrial, institutional, military, and civic uses" using a "compatible mix of land uses that support active transportation and a healthy environment" and a "variety of housing types for all age, income, and social groups." The CPU was designed to incorporate residential uses near transit hubs, revitalized employment areas, and public spaces to "allow people to live and work within the community."

To implement these goals, the CPU rezoned areas with City-wide zoning designations and amended the Municipal Code to adopt new Community Plan Implementation Overlay Zone designations, including a mixed commercial residential land use designation. The final CPU stated the "Coastal Height Limit Overlay Zone limits the height of new buildings to protect coastal views."

D.   *2020 Adoption of Ordinance for Ballot Measure to Exclude Midway-Pacific Highway CPU From the Coastal Zone Height Limit*

1.   *Introduction of Proposal*

In January 2020, a community member sent an e-mail to Vickie White, a senior planner in the City's planning department, asking for contact information for a person "who's up to date on zoning modifications / changes to the 30' Height Limit in the Midway District." White copied the planner responsible for the Midway-Pacific Highway area with her response and stated, "Regarding the Coastal Height Limit Overlay Zone: While interest in raising the [limit] was expressed by community members during the community plan update process, Planning Department staff communicated that it is not in our work program to propose changes to the height limit via a public vote (as required by the overlay zone)." She explained the City Council can place measures on the ballot for a city-wide vote or citizens can gather signatures to place an item on the ballot. She was not aware of any initiatives about the issue and suggested contacting Councilmember Jennifer Campbell about her stance.

The following month, in February 2020, City Councilmembers Campbell and Chris Cate sent a memorandum to the City Council President asking the City's Rules Committee to consider placing a City-sponsored measure on the November 2020 ballot to amend Municipal Code section 132.0505 to remove the coastal height limit for the entirety of the Midway-Pacific Highway Community Plan area.

Over the following weeks, Councilmembers Campbell and Cate engaged in community meetings and did media interviews about removing the height limit in the Midway-Pacific area. Members of the public wrote letters in support of and in opposition to the idea. The councilmembers said the 30-foot

8

height limit on all buildings west of Interstate Highway 5 was intended "to protect the ocean views in neighborhoods such as La Jolla and Point Loma." They said it included "the Midway and Pacific Highway communities, even though neither area is home to ocean views."

A community member expressed concern with the proposal saying the area was historically a coastal salt marsh and sand dune habitat. She said the 30-foot height limit was "designed for coastal areas of which the Midway District clearly is one . . ." and that "[t]he point of the thirty-foot height limit is not maintaining some special residential area, but to keep our coastal areas open." She concluded, "The coastal zone is not just the beach, it includes consideration of natural landscapes, patterns of air flow and the ever-precious cooling effects of fog." A staff member from Councilmember Campbell's office disagreed that the height limit "was designed to keep the coastal area 'open' in environmental terms." He argued the intent of the height limit "was to ensure that folks could visually see the water from their living rooms." He argued that taller structures would provide more open space.

2. *May 13, 2020 Rules Committee Meeting*

The matter was heard at the City's Rules Committee meeting on May 13, 2020. Councilmember Campbell presented information about the history of the area and pointed out that the Sports Arena building is 77 feet high. She said the proposal would "cause the end of the 30-foot limit, and fall back into what's already in place in the zoning, and that is the existing Municipal Code height requirements, which vary parcel to parcel in this small area. Currently, it runs between 30 to a hundred feet in height."

Councilmember Cate said the Coastal Height Limit Overlay Zone was passed by a citizens' initiative in 1972 "with the spirit and intent to preserve

9

and protect public view corridors along the coast." He commented that the Midway Community Plan area, "although west of Interstate [Highway] 5 . . . is not the same as other neighborhoods on the coast that have view corridors, which has led to the support of this proposal by the Midway-Pacific Highway Planning Group . . . ." Cate believed "this proposal, if approved by voters, would allow for the community economic benefits outlined in the Midway Community Plan to be expedited and come to life faster."

Community members made public comments both opposing and supporting the proposal. Those in favor said the area desperately needs development and the measure was a correction to an arbitrary boundary because the Midway area should not be considered part of the Coastal Zone. Some opposed to the measure expressed concern that an "attack on the 30-foot coastal height limit" was "the first step toward eliminating that height limit on the coast." Others expressed concern that the measure was an "incremental move to basically block anybody inland from being able to enjoy the coast" by commercializing property owned by the City. Some said the measure was unnecessary and they preferred considering lifting the limit for specific projects rather than turning the area into a major commercial area with tall buildings and expensive condominiums.

Members of the Midway-Pacific Planning Group said the "group is completely in support of lifting the height restriction for this area only – not for areas that are on the coast, not for areas that are near the coast, but areas within this Sports Arena Pacific range, that desperately need[ ] development, and an infusion of serious money from developers who should pay for additional amenities, and the projects that they propose to build, that will yield housing, and a far better presentation than the low height that is currently allowed." The group, which consists of businesses and residents,

did not believe Midway should be considered part of the Coastal Zone and the proposal was a correction to an arbitrary boundary. Other individuals expressed support for the proposal to "unleash" needed housing supply, including development of low to moderate income housing.

The Rules Committee referred the proposal to the City Attorney's Office for further review and legal analysis.

3.      *Discussions Regarding Possible CEQA Analysis*

A few days later, after discussions with the City Attorney's office, a staff member for Councilmember Campbell asked the Director of the City Planning Department (Director) if the environmental impact report (EIR) from the CPU would suffice for any CEQA analysis triggered by the ballot proposal. The Director forwarded the inquiry to Heidi Vonblum, the City's Environmental Policy Program Manager, who responded, "if Midway EIR was done with the coastal height limit in place, and now it's proposed to be taken out, then the new height wasn't analyzed."

The next day, Alyssa Muto, the Deputy Director of the Environment and Mobility Division of the City's planning department, responded saying she thought "we did not limit with height, but analyzed the buildout of zoning." She asked several individuals if they considered new zoning above 30-feet when they did the plan with the idea that the height limit would be increased or removed someday.

White responded, "We did not consider the height limit in our analysis. Our future land assumptions are based on the adopted zoning. We did some feasibility analyses and looked at existing built densities to show that the plan densities are achievable within the 30 foot height limit."

Muto then wrote to the Director and Vonblum saying, "We did the analysis based on the land use and zoning and did not consider the Prop D

11

height limit in our analysis. We did anticipate that a removal of Prop D in this community could be possible in the future, so our analysis was to ensure maximization of land use could occur if, and when, a ballot initiative comes forward. . . . We did do some feasibility analyses and looked at existing built densities to show that the plan densities are achievable within the 30 foot height limit."

4. *June 10, 2020 Rules Committee Meeting*

Councilmembers Campbell and Cate again presented the proposal to the Rules Committee. Many individuals spoke in support of and in opposition to the proposal.

The Rules Committee voted to forward the proposal to the City Council for the November 2020 ballot.

5. *Public Response to Councilmembers' Statements That No Views Will Be Impacted By the Proposal*

The day after the Rules Committee voted to forward the proposal to the City Council, a resident wrote to several councilmembers. He said he generally favored "denser development in the Midway area" and commented that the elimination of the height limit may be favorable. But he asked, "What heights are being considered?"

He disagreed with councilmembers' statements to a local newspaper saying no views will be impacted by the ballot measure. The resident said, "That is untrue. [¶] Hundreds of homes in Mission Hills, [Point] Loma, Linda Vista and Claremont look out over Midway/Sports Arena." He provided a photo taken from his backyard looking west over Interstate Highway 5 and "the Sports Arena area to the San Diego River, Mission Beach and the Pacific Ocean."

12



6.      *Preparation of the Staff Report for City Council Consideration*

In July 2020, a staff member for Councilmember Campbell sent Muto an e-mail saying the City Council was scheduled to consider the ballot measure at its July 21, 2020 meeting.  The staff member asked for recommendations about language for the environmental impact section of a staff report he was preparing about the measure.  He included language he "copied and pasted" from another source.  His suggested language said the "activity is not a project as defined by the California Environmental Quality Act Section 21065 and State CEQA Guidelines Section 15378(b)(5), as it is an organizational or administrative activity of government that will not result in direct or indirect physical changes in the environment."

Muto expressed concern that the proposed language was not "the correct environmental determination as there would be implementation that

13

could occur with approval of the initiatives by the voters. However, . . . the EIR did account for the underlying zoning which includes heights greater than the 30 foot height limit. Therefore, the future development with the underlying zoning height was analyzed within our CPU adopted with[in] the last year or two." She copied Vonblum with her response.

Vonblum responded, "let's use the CPU EIR to cover the increased height."

The final July 6, 2020 staff report described the proposed actions as requesting that "the City Council adopt the ordinance in Sub-item A to place on the November 3, 2020 Municipal Special Election ballot one measure that would amend People's Ordinance O-10960 (New Series) and San Diego Municipal Code Section 132.0505 to exclude only the Midway-Pacific Highway Community Plan Area from the 30-foot height limit on buildings in the Coastal Zone, as defined in Ordinance O-10960; and adopt the resolution in Sub-item B, directing the preparation of related ballot materials." This amendment would "potentially allow[ ] taller buildings to be built, if they are in compliance with other governing laws." The report said the "recently approved 2018 Midway-Pacific Highway Community Plan defines zones with specific height requirements now codified within the municipal code. This amendment proposes to simply remove the coastal height limits within the Midway Community Plan Area and leave in place the existing municipal code height requirements which vary per zone. Currently, there is no new height limit proposed beyond the existing zoning."[5]

---

[5] The last two sentences appear to respond to a question posed during a public hearing about whether the proposal would include a different "meaningful height limit" that would still allow for moderated growth in the area. Councilmember Campbell clarified the "proposal will cause the end of the 30-foot limit, and fall back into what's already in place in the zoning, and

14

Under a heading "Environmental Impact," the staff report stated, "This activity is adequately addressed in the Midway-Pacific Highway Community Plan Update Final Program Environmental Impact Report (approved September 25, 2018; SCH No. 2015111013) and is part of a series of subsequent discretionary actions, and therefore, not considered to be a separate project for purposes of CEQA review as defined in CEQA Guidelines Section 15378(c). Pursuant to CEQA Guidelines Section 15162, there is no change in circumstance, additional information, or project changes that would warrant additional environmental review."

7. *Further Public Comments*

Before the scheduled City Council meeting, constituents again submitted written comments both opposing and supporting the proposal. Many opposed to the proposal cited concerns about traffic congestion, parking, and air quality. Many also included comments about the impact the proposal would have on the views and beauty of the area. One person commented, "What makes San Diego unique and beautiful is the expansive views, in part because of the height limit in coastal areas." Another person said, "the Midway area DOES have views, or at the very least, it facilitates views to other areas." She pointed out that development in the Midway area would "block the views to downtown, it would block the views to Mission Hills." Another constituent said, "the development projects you are proposing with high-rises in that location would create more urban heat islands thereby exacerbating our environmental issues."

In an e-mail supporting the ballot measure, the Midway Community Planning Group said Midway is not a coastal community and should not have

that is the existing Municipal Code height requirements, which vary parcel to parcel in this small area."

15

been included in Prop D in 1972 when the "convenient and arbitrary I-5 boundary was put in place." The planning group said the 2018 updated community plan "is silent on increasing the height limit, we did so intentionally because that was our reality, and we had to plan for what we had."

Save Our Access submitted a letter saying the proposed ballot measure was subject to CEQA and "the City should prepare an EIR before proceeding" because "the Proposed Ballot Measure is likely to lead to several significant impacts, including impacts to community character, aesthetics, land use, traffic, human health, air quality, water quality, and greenhouse gas emissions." The letter disagreed with the staff report's statement that the impacts were considered in the Midway-Pacific Highway Community Plan EIR. Save Our Access argued the CPU did not consider or anticipate amending or removing the Coastal Zone height limits and it cited several sections of the PEIR that did not refer to or consider removal of the Coastal Zone height limits. It cited a subsection of the PEIR regarding visual effects and neighborhood character that stated, " 'future projects in the southeastern corner of the proposed CPU area would blend with the existing urban framework through established and regulated height and setback regulations, and would not result in new obstructions to view corridors along public streets where view opportunities largely exist.' " Save Our Access argued that "[r]emoving building height limits would conflict with the prior environmental analysis of the Final PEIR, which concluded: 'Implementation of the proposed Midway-Pacific Highway CPU would not result in a substantial alteration or blockage of public views . . . new development within the community would take place within the constraints of the existing urban framework and development pattern."

16

8.	*Adoption of Ordinance*

The City Council considered the proposal on July 21, 2020. Councilmember Campbell said the Midway Community Plan Update went through "a very robust process" and was approved in 2018, but the community needed to "build up, not out, to achieve the desired green space." Councilmember Cate said, "removing the height limit will be the catalyst for this community planning area, and the ability to achieve the goals that were outlined in the Community Plan Update."

A representative of Save Our Access spoke in opposition to the proposal.  He disputed the accuracy of the staff report's statement that removal of the height limit would leave in place existing Municipal Code height limits.  He pointed out that the City was at that time considering a specific housing project with a key component that allowed applicants to "get a waiver from height requirements."  He argued, "That would override the Community Plan, and override the existing zoning.  An applicant could demand, and receive a ministerial approval for a project of any height" which could "override" those limits to raise or eliminate them parcel by parcel.

Several speakers from the Midway Community Planning Group Board expressed support saying it was a mistake to include the Midway area in the Coastal Zone because there are no coastal views.

The City Council passed a resolution directing the City Attorney to prepare a ballot title, summary, and impartial analysis and directing the Mayor, the Independent Budget Analyst and City Auditor to prepare a fiscal impact analysis.

Ordinance O-21220 was passed on July 24, 2020, which submitted to the voters of San Diego the question of removing the 30-foot height limit in the Midway-Pacific Highway Community Plan.

17

Thereafter, on July 27, 2020, the City's planning department issued a memorandum stating it had completed a CEQA "Section 15162 consistency evaluation in compliance with . . . Section 21166 for the proposed ballot measure to amend People's Ordinance O-10960 and Municipal Code Section 132.0505 to exclude the Midway-Pacific Highway Community Plan Area from Coastal Zone Height Limits."  The "evaluation was performed to determine if conditions specified in CEQA Guidelines Section 15162 would require preparation of a subsequent environmental document."  The planning department concluded, "the proposed amendments are consistent with the Midway-Pacific Highway Community Plan Update . . . and would not result in new significant impacts."

The memorandum and Subsequent Notice of Determination concluded the proposed ballot measure "to exclude the Midway-Pacific Highway Community Plan Area from Coastal Zone Height Limits would not result in new significant environmental effects or substantially increase the severity of previously identified significant effects.  The amendments on the ballot measure would not result in any physical environmental effects over and above those analyzed in the Midway-Pacific Highway CPU PEIR, which included an analysis of the visual impacts of the implementation of the Midway-Pacific Highway CPU."

E.    *Trial Court Proceedings*

Save Our Access filed a petition for writ of mandate in August 2020, challenging the City's approval of the ballot measure contending that the City failed to follow the procedures mandated by CEQA.

In its opening brief in support of the writ petition, Save Our Access stated the City's adoption of Ordinance O-21220 placing the measure to remove the height limit on the ballot constituted a project subject to CEQA.

18

It argued the City abused its discretion by adopting the ordinance approving the ballot measure "without first conducting any environmental review." It contended the adoption of the ordinance will have significant environmental impact and the PEIR for the CPU did not adequately address those impacts. Save Our Access asked the court to set aside the City's action until compliance with CEQA is accomplished.

The City's opposition brief argued the PEIR analyzed the environmental impacts of the Midway-Pacific Highway CPU without considering the 30-foot height restriction in the Coastal Zone because it analyzed maximum residential densities based on proposed land use designations using City-wide designations for base zones. It further argued that substantial evidence supported the Planning Department's conclusion that the ordinance was within the scope of the PEIR and it did not need to prepare a supplemental or subsequent EIR because there were no unexamined environmental impacts.

After considering written and oral arguments of the parties as well as the administrative record, the trial court granted the petition for writ of mandate. The court concluded the PEIR's project description could not be read to include the adoption of an ordinance approving a ballot measure to remove the Coastal Zone height limit as a "later activity" within the scope of the PEIR. Thus, the court determined the "applicable inquiry is whether the evidence supports a fair argument" that approval of such a ballot measure "may have significant environmental impact that was not examined" in the PEIR. (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316, 1318 (*Sonoma*).) The court determined the administrative record contained substantial evidence showing the PEIR did not examine the potential impact on scenic vistas or views of removing the 30-foot Coastal Zone height limit

19

and the City should have prepared a tiered EIR to consider the impact of the ordinance approving the ballot measure on the environment. The court concluded, "[b]ecause an environmental review of the impacts of removing the height limit is being directed for the reasons noted above, it is anticipated such environmental review will analyze the potential other impacts associated with the [o]rdinance."

The court entered a judgment on January 20, 2022 in favor of Save Our Access. It also issued a writ of mandate ordering the City to "set aside all approvals . . . of Ordinance No. O-21220 N.S. that submitted a ballot measure to the qualified voters of the City of San Diego to amend People's Ordinance O-10960 and Municipal Code 132.0505 to exclude the Midway-Pacific Highway Community Plan Area from Coastal Zone Height Limits ('Project')" and prohibiting "any steps to further the Project until lawful approval is obtained from the City." The City appealed.

III.

DISCUSSION

The City contends substantial evidence supports its determination that the ballot measure to remove the height limit for the Midway-Pacific Highway Community was addressed in the 2018 PEIR and the trial court erred in failing to give that determination deference. Save Our Access disagrees, contending the 2018 PEIR did not consider eliminating the Coastal Zone height limit or any associated impacts. We begin with an overview of the CEQA procedures and a discussion of the standard of review before analyzing the merits of the arguments.

A.    **Overview of CEQA's Policy and Procedures**

"The purpose of CEQA is to ensure that a public agency regulates activities to prevent environmental damage (§ 21000, subd. (g)) and to alert

20

the public and officials to environmental change so they can 'consider meaningfully the [environmental] issues raised by the proposed project[.]' " (*Ocean Street Extension Neighborhood Assn. v. City of Santa Cruz* (2021) 73 Cal.App.5th 985, 1006 (*Ocean Street*) citing *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, 405 (*Laurel Heights*).)

CEQA "and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' " (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 (*Tomlinson*) quoting Cal. Code Regs., tit. 14, § 15002; hereafter Guidelines.)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency. (§ 21065.)" (*Tomlinson, supra*, 54 Cal.4th at p. 286.) If the proposed activity is a

"project," the second step requires the public agency to decide whether it is exempt from compliance with CEQA under narrow circumstances. (*Ibid.* citing §§ 21080, 21084, subd. (a); Guidelines, § 15300.) "If a project does not fall within a CEQA exemption, the lead agency conducts an initial study to determine whether the project may have a significant impact on the environment. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380; [Guidelines], §§ 15063, subd. (a), 15002, subd. (k)(2)[.])" (*Ocean Street, supra*, 73 Cal.App.5th at p. 1002.) "If the administrative record before the agency contains substantial evidence that the project may have a significant effect on the environment . . . it must go to on the third stage of the CEQA process: preparation and certification of an EIR. (§ 21100, 21151; Guidelines, § 15002, subd. (k)(3), 15063, subd. (b)(1), 15064, subds. (a)(1), (g)(1), 15362.)" (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1372.)

"The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511–512 (*Fresno*).) The Supreme Court has described the EIR as " 'an "environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." [Citations.] The EIR is also intended to "demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action." [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will

22

know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government.' ([*Laurel Heights, supra*, 47 Cal.3d at p. 392].) The EIR 'must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' (*Id.* at p. 405.)" (*Ocean Street, supra*, 73 Cal.App.5th at p. 1003.)

The " 'Guidelines describe several types of EIR's, which may be tailored to different situations. The most common is the project EIR, which examines the environmental impacts of a specific development project. (Guidelines, § 15161.)" (*Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 605 (*CREED*).)

" 'A quite different type is the program EIR, which "may be prepared on a series of actions that can be characterized as one large project and are related either: (1) Geographically, (2) As logical parts in the chain of contemplated actions, (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways." (Guidelines, § 15168, subd. (a); [citation].)' " (*CREED, supra*, 134 Cal.App.4th at p. 605.)

"Later activities in the program must be examined in the light of the program EIR to determine whether an additional environmental document must be prepared." (Guidelines, § 15168, subd. (c).) "If a later activity would have effects that were not examined in the program EIR, a new initial study

23

would need to be prepared leading to either an EIR or a negative declaration. That later analysis may tier from the program EIR as provided in Section 15152." (*Id.*, subd. (c)(1).) "If the agency finds that pursuant to Section 15162, no subsequent EIR would be required, the agency can approve the activity as being within the scope of the project covered by the program EIR, and no new environmental document would be required. Whether a later activity is within the scope of a program EIR is a factual question that the lead agency determines based on substantial evidence in the record. Factors that an agency may consider in making that determination include, but are not limited to, consistency of the later activity with the type of allowable land use, overall planned density and building intensity, geographic area analyzed for environmental impacts, and covered infrastructure, as described in the program EIR." (*Id.*, subd. (c)(2).)[6]

---

[6]    Generally, "CEQA directs agencies to 'tier' EIR's whenever feasible, in part to streamline regulatory procedures and eliminate repetitive discussions of the same issues in successive EIR's. [Citations.] Section 21068.5 defines 'tiering' as the 'coverage of general matters and environmental effects in an [EIR] prepared for a policy, *plan, program* or ordinance followed by narrower or site-specific [EIR's] which incorporate by reference the discussion in any prior [EIR] and which concentrate on the environmental effects which (a) are capable of being mitigated, or (b) were not analyzed as significant effects on the environment in the prior [EIR].' " (*Sonoma, supra*, 6 Cal.App.4th at pp. 1318–1319 quoting Guidelines, § 15152, italic added by *Sonoma*.) "Where a prior [EIR] has been prepared and certified for a program [or] plan, . . . the lead agency for a later project . . . shall examine significant effects of the later project upon the environment by using a tiered [EIR], except that the report on the later project is not required to examine those effects that the lead agency determines were either of the following: [¶] (1) Mitigated or avoided . . . as a result of the prior [EIR]. [¶] (2) Examined at a sufficient level of detail in the prior [EIR] to enable those effects to be mitigated or avoided by site-specific revisions, the imposition of conditions, or by other means in connection with the approval of the later project." (§ 21094, subd. (a).) To determine if a tiered EIR is appropriate, the lead agency must

24

If an EIR has been prepared for a project, "section 21166 prohibits agencies from requiring a subsequent or supplemental EIR unless 'substantial changes' are proposed in the project or in its circumstances which will require 'major revisions' in the EIR, or unless certain new information becomes available." (*Sonoma, supra*, 6 Cal.App.4th at p. 1317.) But section 21166 controls "only when the question is whether more than one EIR must be prepared for what is essentially the same project." (*Id.* at p. 1320.)

The Supreme Court explained "when a program EIR is employed, if a later proposal is not 'either the same as or within the scope of the project . . . described in the program EIR,' then review of the proposal is not governed by section 21166's deferential substantial evidence standard. (*Sierra Club, supra*, 6 Cal.App.4th at p. 1321, citing CEQA Guidelines, § 15168, subd. (c)(5).) Instead, under . . . section 21094, the agency is required to apply a more exacting standard to determine whether the later project might cause significant environmental effects that were not fully examined in the initial program EIR." (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 960 (*San Mateo Gardens*).)

" 'The standard for determining whether to engage in additional CEQA review for subsequent projects under a tiered EIR is more relaxed than the prohibition against additional review imposed by . . . section 21166 for project EIR's.' (*Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 528.) . . . [W]hen a tiered EIR has been prepared, review of a subsequent project proposal is more searching. If the subsequent project is consistent with the program or plan for which the EIR

---

"analyze whether the later project may cause significant effects on the environment that were not examined in the prior [EIR]." (*Id.*, subd. (c).)

25

was certified, then 'CEQA requires a lead agency to prepare an initial study to determine if the later project may cause significant environmental effects not examined in the first tier EIR.' (*Ibid.*, citing Pub. Resources Code, § 21094, subds. (a), (c).) 'If the subsequent project is not consistent with the program or plan, it is treated as a new project and must be fully analyzed in a project—or another tiered EIR if it may have a significant effect on the environment.' " (*San Mateo Gardens, supra*, 1 Cal.5th at p. 960.)

## B.     Standard of Review on Appeal

" 'In a CEQA case, as in other mandamus cases, our review of the administrative record for error is the same as the trial court's; we review the agency's action, not the trial court's decision.' (*Muzzy Ranch*[*, supra*, 41 Cal.4th at p.] 381.) Our review of the City's action requires us to consider whether the City abused its discretion either (1) by failing to proceed in the manner required by law, or (2) by making a factual conclusion unsupported by substantial evidence. (§§ 21168, 21168.5; *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 131.) We determine de novo whether the City failed to proceed in the manner required by law while we accord greater deference to the City's factual conclusions. (§§ 21168, 21168.5; *Save Tara*, at p. 131.)" (*Save Our Heritage Organisation v. City of San Diego* (2018) 28 Cal.App.5th 656, 663–664.) "The precise standard of review to be used in determining whether an agency has abused its discretion under CEQA varies depending on the type of claim under review." (*CREED, supra*, 134 Cal.App.4th at p. 605.)

"In evaluating an EIR for CEQA compliance, . . . , a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts. For example, where an agency failed to require an applicant

to provide certain information mandated by CEQA and to include that information in its environmental analysis, [the Supreme Court] held the agency 'failed to proceed in the manner prescribed by CEQA.' [Citations.] In contrast, in a factual dispute over 'whether adverse effects have been mitigated or could be better mitigated' [citation], the agency's conclusion would be reviewed only for substantial evidence." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435.)

## C.     Application

### 1.     *The Ballot Measure Was a Project Subject to CEQA*

The parties agree that when a public agency initiates submission of a ballot measure to voters to amend an ordinance it is a "project" subject to CEQA. (*Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 171 (*Sierra Madre*).) "[I]nitiative measures generated and placed on the ballot by a public agency are not exempt from CEQA. Before placing any such measure that may lead to voter approval of a project on the ballot, the agency must comply with CEQA. If compliance leads to the preparation and consideration of an EIR, when that process is final the information contained in the EIR must be made available to the electorate for its consideration prior to the election." (*Id.* at p. 191.)

The Supreme Court explained the significant policy difference between initiatives generated by a public entity such as a city council and those sponsored by voters, "Voters who are advised that an initiative has been placed on the ballot by the city counsel will assume that the city council has done so only after itself making a study and thoroughly considering the potential environmental impact of the measure. For that reason, a preelection EIR should be prepared and considered by the city council before

27

the council decides to place a council-generated initiative on the ballot. By contrast, voters have no reason to assume that the impact of a voter-sponsored initiative has been subjected to the same scrutiny and, therefore will consider the potential environmental impacts more carefully in deciding whether to support or oppose the initiative." (*Sierra Madre, supra,* 25 Cal.4th at p. 190.)

> 2. *There is No Substantial Evidence to Support the City's Determination That the Ballot Measure Was a Later Activity Within the Scope of the 2018 PEIR*

The City contends it was not required to prepare a supplemental EIR because it determined the ballot measure was consistent with the 2018 CPU and the PEIR adequately considered environmental impacts from the removal of the height limit. In support of that position, it cites the staff report for the City Council meeting and a memorandum issued by the Planning Department several days after the Ordinance was approved. The memorandum stated it had conducted a "consistency evaluation" in compliance with section 21166 for the proposed ballot measure and determined that "the proposed amendments are consistent with the Midway-Pacific Highway Community Plan Update . . . Final Program Environmental Impact Report . . . and would not result in new significant impacts." In a footnote to the background section, the memorandum stated the CPU, "which included rezoning the land within the CPU area to be consistent with the Community Plan, only included the heights identified within the proposed zoning and land use regulations." The City contends we must give these determinations deference.

> a. *Applicable Legal Standard*

When an agency has prepared an EIR or a program EIR, we review a decision not to prepare a supplemental or subsequent EIR for a later project

28

or activity under the substantial evidence standard of review. (*CREED, supra,* 134 Cal.App.4th at p. 610.) " 'We independently review the administrative record. [Citation.] We resolve reasonable doubts in favor of the administrative decision. [Citation.] "We do not judge the wisdom of the agency's action in approving the Project or pass upon the correctness of the EIR's environmental conclusions. [Citations.] Our function is simply to determine whether the agency followed proper procedures and whether there is substantial evidence supporting the agency's determination that the changes in the Project (or its circumstances) were not substantial enough to require an SEIR." ' " (*Id.* at p. 615.)

For CEQA purposes, the Guidelines state, "the substantial evidence test . . . does not, . . . , refer to substantial evidence that the project, as modified, will necessarily have significant environmental effects. It instead refers to substantial evidence that the proposed modifications will involve '[s]ubstantial changes' that 'require major revisions of the previous EIR or negative declaration due to the involvement' of new or significantly more severe environmental effects." (*San Mateo Gardens, supra,* 1 Cal.5th at p. 957 citing Guidelines, § 15162, subd. (a).)

" 'Substantial evidence' as used in these guidelines means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the

29

environment does not constitute substantial evidence." (Guidelines, § 15384, subd. (a).) "Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (*Id.*, subd. (b).)

To consider the City's argument we begin with the fundamental premise "that '[a]n accurate, stable and finite project description is the sine qua non of an informative and legally sufficient EIR.' " (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1052.) "[A] project description that gives conflicting signals to decision makers and the public about the nature and scope of the project is fundamentally inadequate and misleading." (*Ibid.*) "Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal (i.e., the 'no project' alternative) and weigh other alternatives in the balance." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 192–193.) When the scope and character of a proposed activity or project is not clear it "can be discerned only in the light of CEQA's policy to 'ensure that the long-term protection of the environment shall be the guiding criterion in public decisions.' " (*Id.* at p. 192.)

b. *Public Statements*

Here, the scoping statement for the PEIR informed the public in 2015 that the "Coastal Height Limit Overlay Zone . . . applies to the entire Midway-Pacific Highway community," which "limits construction of new development to 30-feet in height to protect coastal views."

The final CPU adopted by the City in 2018 said its land use designations were based on the general plan's land use designations and were "tailored as needed to guide development to achieve the overarching

30

Community Plan vision." It included a land use map and a land use designation table, which summarized "the plan land uses and densities" for residential uses measured by dwelling units per acre. Both the map and table referred only to dwelling units per acre. They did not mention building heights.

## FIGURE 2-1: LAND USE MAP



TABLE 2-1: MIDWAY - PACIFIC HIGHWAY COMMUNITY PLAN LAND USE DESIGNATIONS

| GENERAL PLAN LAND USE CATEGORY | COMMUNITY PLAN LAND USE DESIGNATION | RESIDENTIAL DENSITY (DWELLING UNITS/ACRE) |
|---|---|---|
| Residential | Residential - Low Medium | 10 - 14 |
| | Residential - Medium | 15 - 29 |
| | Residential - Medium High | 30 - 54 |
| | Residential - High | 45 - 73 |
| | Residential - Very High | 74 - 109 |
| Commercial, Employment, Retail, and Services | Neighborhood Commercial - Residential Permitted | 0 - 54 |
| | Community Commercial - Residential Prohibited | N / A |
| | Community Commercial - Residential Permitted | 0 - 44 |
| | | 0 - 54 |
| | | 0 - 73 |
| | Heavy Commercial - Residential Prohibited | N / A |
| Multiple Use | Mixed Commercial Residential | 0 - 44 |
| | | 0 - 73 |
| | | 0 - 109 |
| Industrial | Business Park - Residential Permitted | 0 - 44 |
| | Urban Industrial | Live/Work Only |
| Institutional | Institutional | N / A |
| | Military | N / A |
| | Port Properties | N / A |
| | Park | N / A |

The CPU explained the Municipal Code implements the plan policies through zoning and development regulations, but significantly included the caveat, "The Coastal Height Limit Overlay Zone limits the height of new buildings to protect coastal views."

This is consistent with a public comment by a representative from the Midway Community Planning Group in 2020 who said the 2018 updated community plan "is silent on increasing the height limit." The representative explained, "we did so intentionally because that was our reality, and we had to plan for what we had."

c. *PEIR Project Description*

The revised final PEIR described the project as approving and adopting the proposed CPU along with discretionary actions to implement the plan.

These discretionary components included adopting amendments to the general plan to incorporate the CPU as a component of the general plan and to incorporate a mixed commercial residential land use designation, rezoning land within the Midway-Pacific Highway area, and adopting amendments to the Community Plan Implementation Overlay Zone (CPIOZ) for new CPIOZ areas. The project required adoption of amendments to the City's Municipal Code to include new commercial-office and commercial-neighborhood base zones with corresponding parking requirements and application of a Residential Tandem Parking Overlay Zone.[7]

The project description did not mention removal of the Coastal Zone height limit. Indeed, the City concedes the "PEIR did not specifically identify the removal of the 30-foot height limit and revision to the underlying base zones in the project description." The City claims it was not necessary to do so because this was a program EIR.[8]

_____

[7] At oral argument, the City stated these amendments to the Municipal Code only applied to the CPU area, so both the City officials and the public were on notice of potential increased height limits associated with the new base zones. That is not accurate. The new commercial-office and commercial-neighborhood base zones applied throughout the City "to provide distinct regulations for size, intensity, and design to reflect the variety of the desired *development* patterns within San Diego's communities." (San Diego Mun. Code, § 131.0501.) The new residential tandem parking overlay zone as well as the new CPIOZ applied to designated communities throughout the City, not just to the CPU.

Interestingly, editor's notes to the San Diego Municipal Code sections 131.0502 (commercial-neighborhood zones) and 131.0504 (commercial-office zones) state the 2018 amendments adopted by Ordinance No. O-20991 N.S. "will not apply within the Coastal Overlay Zone until the California Coastal Commission Certifies O-20991 N.S. as a Local Coastal Program Amendment."

[8] " 'Designating an EIR as a program EIR . . . does not by itself decrease the level of analysis otherwise required in the EIR. "All EIR's must cover the

33

In support of its position, the City selectively chooses statements from the PEIR and tries to piece together support for its claim that the project description sufficiently included removal of the 30-foot Coastal Zone height limit as a later activity.

The City cites maps in the PEIR depicting proposed land use designations for parcels in the Midway-Pacific using City-wide zoning designations. It then cites a 2021 copy of the Municipal Code with regulation tables for City-wide zones, which summarize a myriad of regulations per zone, including maximum permitted density, minimum lot area and dimensions, setback requirements, maximum floor area ratio, and maximum structure heights, among other things. The City argues that because City-wide base zones allowed maximum structure heights more than 30 feet in some zones, we should understand the CPU anticipated there would be a later proposal to remove the Coastal Zone height limit.

We are not persuaded.

Expecting the court or, more importantly, the public to understand from the CPU that the Coastal Zone height limit could be removed at some future date based only on references to City-wide base zones, is fundamentally inadequate and inappropriate. "Readers of an EIR should not be required to 'ferret out an unreferenced discussion in [related material] . . . . The data in an EIR must not only be sufficient in quantity, it must be presented in a manner calculated to adequately inform the public and decision makers, who may not be previously familiar with the details of

_____

same general content. (Guidelines, §§ 15120–15132.) The level of specificity of an EIR is determined by the nature of the project and the 'rule of reason' [citation], rather than any semantic label accorded to the EIR." [Citation.]' " (*Citizens for a Sustainable Treasure Island, supra*, 227 Cal.App.4th at p. 1048.)

the project.  "[I]nformation 'scattered here and there in EIR appendices,' or a report 'buried in an appendix,' is not a substitute for 'a good faith reasoned analysis . . . .' " ' " (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 941.)

The City's strained argument that removal of the height limit is within the scope of the PEIR is simply not supported by the administrative record. The CPU's proposed land-use map identified the number of dwelling units permitted per acre for specific lots.  The land use table identified the number of residential dwelling units allowed for each community plan designation along with the City-wide base zone designation and the base zone floor area ratio.  The proposed zoning map showed new zoning designations per parcel. The PEIR's project description summary stated, "The land use is analyzed at build-out *using total dwelling unit yield.*"  (Italics added.)  These documents primarily focused on how many dwelling units were allowed per parcel under the newly proposed zones.  There was no discussion or analysis of building heights.

### d.    *PEIR Assumptions and Analysis*

The City's opening brief contends, "[t]he PEIR used these future land use assumptions, *with the associated maximum structure heights*, for 'facility planning, technical elevation, and environmental review purposes."  (Italics added.)  This statement is inaccurate and the quotation is taken out of context.  The complete quote from the executive summary of the PEIR stated, "For facility planning, technical evaluation, and environmental review purposes for this PEIR, two sets of future land use assumptions for the Sports Arena Community Village were prepared."  It explained that one set of assumptions retained a Sports Arena-like structure along with commercial retail, office, and residential uses.  The second set of assumptions replaced

35

the existing Sports Arena building with commercial, office, and residential uses. It assumed that for "purposes of transportation, noise, and air quality analysis," the assumptions without an arena "would generate more future vehicle trips." Therefore, it used that assumption as the proposed CPU. This passage says nothing about using "associated maximum structure heights" for planning or environmental review purposes.

The City claims, "Appendix N of the PEIR makes clear" that "the PEIR analyzed the potential environmental impacts of implementing the CPU *without* the 30-foot height limit" and as a result the ballot measure is "within the scope of the PEIR." (Original italics.) The City again claims reference to City-wide base zones in Appendix N means the analysis included consideration of building heights above 30 feet. However, Appendix N does not support the City's claim.

Appendix N analyzed and compared the environmental impacts of the CPU along with two alternative assumptions for development of the Sports Arena site. Appendix N described the project assumptions as analyzing land use designations in terms of maximum "potential dwelling units" and assumed "development at 100 percent of permitted residential density." Appendix N explained, "there could be sites which could encounter conditions that limit residential development to below the maximum permitted density, such as the presence of *environmental or regulatory constraints* (high water table, *Coastal Height Limit Overlay Zone*, etc.). There could also be developments within the proposed CPU area on sites with land use designations that permit mixed uses which incorporate solely non-residential uses, and some developments could use the state and City affordable housing density bonus program to exceed the proposed maximum residential densities." (Italics added.) Considering these scenarios, it concluded the

36

"residential density assumption is a realistic approximation of the dwelling unit growth that will result from implementation of the proposed CPU, which is a conservative approach that does not underestimate impacts."

On its face, the description in Appendix N assumed the Coastal Zone height limit applied and potentially limited the number of dwelling units that could be built.  It took a conservative approach by considering maximum dwelling units.  This approach was based not on an assumption that the height limit did not apply, but on a presumption that developers could obtain an exception for some lots to exceed maximum dwelling units specified in the City-wide base zones.  We cannot, and will not, read this discussion to say Appendix N considered all potential environmental impacts of implementing the CPU *without* the 30-foot height limit.

The PEIR said the CPU would have less than significant impacts on the visual effects and neighborhood character of the area because, "Implementation of the project would not result in substantial alteration or blockage of public views or scenic highways from critical view corridors, designated open space areas, public roads, or public parks; new development within the community would take place *within the constraints of the existing urban framework and development pattern . . . .*"  (Italics added.)  With respect to whether the project would result in a "substantial alteration (e.g., bulk, scale, materials or style) to the existing or planned (adopted) character of the area," the PEIR stated the "CPU includes policies that would encourage residential and mixed-use development that would be consistent with and improve the existing neighborhood character, and impacts would be less than significant."  It also stated there would be less than significant alteration to the existing landform since the area is largely developed and impacts related to light or glare that could adversely affect daytime or

37

nighttime views in the area "would be less than significant." Appendix N said the potential visual effects and impacts of the CPU and alternative assumptions would be similar because they "include the same land use and urban design policies" and "would generally produce a similar bulk and scale of development."

Reading the CPU and the PEIR together, there is no suggestion the PEIR considered potential environmental impacts of removing the Coastal Zone height limits. The CPU presumed the Coastal Zone height limit would limit building heights and the PEIR presumed the existing land use policies would produce similar bulk and scale of development for projects within the CPU.

> e.    *Subsequent E-mail Statements By the Planning Department*

When the trial court asked the City for a record citation to support its claim that the PEIR studied the plan without the 30-foot height limit, it cited the e-mails between the planning staff in 2020, two years after the City adopted the PEIR.

One of the first e-mails in the chain said, "if Midway EIR was done with the coastal height limit in place, and now it's proposed to be taken out, then the new height wasn't analyzed."

Muto sent several e-mails to other staff members asking if they considered "new zoning above 30[ ]feet" or if they analyzed "only up to 30 feet in the Midway plan and EIR."

White responded, "We did not consider the height limit in our analysis. Our future land assumptions are based on the adopted zoning. We did some feasibility analysis and looked at existing built densities to show that the plan densities are achievable within the 30 foot height limit."

38

Muto relayed this information to others saying, "We did the analysis based on the land use and zoning and <u>did not</u> consider the Prop D height limit in our analysis. We did anticipate that a removal of Prop D in this community could be possible in the future, so our analysis was to ensure maximization of land use could occur if, and when, a ballot initiative comes forward. . . . We did do some feasibility analyses and looked at existing built densities to show that the plan densities are achievable within the 30 foot height limit."

The City relies on the White and Muto e-mails to support its claim that the planning department considered heights above 30 feet for the PEIR analysis. This interpretation is not supported either by the full context of the e-mails or the administrative record. As the trial court pointed out, the phrase "did not consider" could either mean "the program EIR did not consider – and thus did not analyze – the impacts of removing the limit, or . . . they removed the 30-foot height limitation when conducting their analysis."

The record and the context of the e-mails support the first interpretation. The portions of the e-mails saying they "did not consider" the height limit for purposes of land use assumptions is limited by the later portion of the e-mails saying they conducted a feasibility analysis, including looking at existing buildings, "to show that the plan densities are achievable within the 30 foot height limit." This is consistent with the PEIR, which, as we have discussed, focused its analysis on maximum dwelling units, not on building heights.

39

This is also demonstrated by pictorial evidence in the record provided by the planning department of existing buildings that maximized dwelling units within the 30-foot height limit.

PRA.04695



Save our Access v. City of San Diego  013227

PRA.04696



Save our Access v. City of San Diego  013228

Additionally, the renderings in the CPU provide important insight because the CPU said, "The text and figures of the Community Plan . . . are of equal importance in communicating the intent of the plans' land use policies." Significantly, the renderings give no indication the City considered building heights above 30 feet. Rather, they depict proposed developments in compliance with the 30-feet height limit.



Land Use, Villages & Districts

FIGURE 2-4: SPORTS ARENA COMMUNITY VILLAGE DEVELOPMENT VISION

Conceptual renderings have been developed to illustrate the vision and plan policies for the community villages.

Development incorporating parking structures; can accommodate shared parking arrangements.

Park or plaza centrally located within village. Development facing park/plaza.

Horizontal mixed-use, retail along main street and residential fronting park/plaza.

Parking located behind buildings to support pedestrian activity.

Pedestrian spaces that can also support outdoor markets.

Development with active ground floor fronting linear park

Network of new streets provides connectivity within the superblock

Midway - Pacific Highway Community Plan | LU-29

Save our Access v. City of San Diego 014907

41



Midway - Pacific Highway

FIGURE 2-6: DUTCH FLATS URBAN VILLAGE DEVELOPMENT VISION

Conceptual renderings have been developed to illustrate the vision and plan policies for the community villages.

Developments that incorporate active ground floors and pedestrian nodes along main streets.

Park or plaza centrally located within village. Development facing park/plaza.

Linear parks provide recreation opportunities and connections to other parks.

MIDWAY DR

DUTCH FLATS PKWY

Network of new streets provides connectivity within the superblocks.

New streets will feature non-contiguous sidewalks, street trees, bicycle facilities, and can incorporate storm water infiltration features.

Development entrances fronting linear park

LU-32 | Midway - Pacific Highway Community Plan

Save our Access v. City of San Diego  014910

Excerpts from after-the-fact e-mails providing unsubstantiated opinions do not constitute substantial evidence.  (Guidelines, § 15384.)  Considering the e-mails in context with the administrative record, they do not support the City's argument that the PEIR considered environmental impacts of buildings above the 30-foot Coastal Zone height limit.  Even if some individuals in the planning department considered the *possibility* the height limit could be eliminated in the future, the PEIR did not clearly communicate such a possibility to the public.  White explained it was not in the planning department's "work program to propose changes to the height limit."

This is not like the situation in *CREED, supra*, where the City pointed to considerable evidence in support of its determination that the environmental impacts of a hotel project were adequately considered in a program EIR prepared in connection with a community plan. (*CREED, supra*, 134 Cal.App.4th at pp. 603–604, 616.)

It is more like the facts in *Sonoma, supra*, 6 Cal.App.4th 1307, where a county certified and adopted a program EIR regarding gravel and hard rock mining along with a specific management plan for regulating such mining, including regulations about proper site reclamation. Several years later, a landowner applied for (1) an amendment to the program EIR to transfer the "Managed Resource: Mineral" designation from one parcel of land to another that was designated for agricultural use, (2) a use permit to mine some of the redesignated land, and (3) an amendment to the program EIR to allow different material to be used for site reclamation than that specified in the original program EIR. (*Sonoma, supra*, at pp. 1313–1314.) After conducting several hearings, the county board of supervisors adopted a negative declaration concluding that, except for modification of the fill used for site reclamation, all environmental impacts that might result from the proposed changes were considered in the program EIR. (*Id.* at p. 1314.) The appellate court determined that the request to mine on land that was designated as an agricultural resource was not within the scope of the project or plan described in the program EIR. It, therefore, applied the fair argument test to determine if further environmental analysis was necessary under CEQA. (*Sonoma,* at pp. 1320–1321.)

Likewise here, removing the Coastal Zone height limit from the Midway-Pacific Highway Community Planning Area is a significant change that was not considered in the PEIR. Where "a later proposal is not 'either

43

the same as or within the scope of the project . . . described in the program EIR,' then review of the proposal is not governed by section 21166's deferential substantial evidence standard. [Citations.] Instead, under . . . section 21094, the agency is required to apply a more exacting standard to determine whether the later project might cause significant environmental effects that were not fully examined in the initial program EIR." (*San Mateo Gardens, supra*, 1 Cal.5th at p. 960 citing *Sierra Club, supra*, 6 Cal.App.4th at p. 1321; CEQA Guidelines, § 15168, subd. (c)(5).) Therefore, we must turn then to the question of whether there is a fair argument that further environmental analysis is necessary.

3. *Unexamined Environmental Impacts From Removal of the Height Limit Require Further Environmental Analysis*

a. *Applicable Legal Standards*

"A court reviewing an agency's decision not to prepare an EIR in the first instance must set aside the decision if the administrative record contains substantial evidence that a proposed project might have a significant environmental impact; in such a case, the agency has not proceeded as required by law. [Citation.] Stated another way, the question is one of law, i.e., 'the sufficiency of the evidence to support a fair argument.' [Citation.] Under this standard, deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary." (*Sonoma, supra*, 6 Cal.App.4th at pp. 1317–1318.) Therefore, we apply the fair argument test de novo and "we review the administrative record to determine whether it is free from legal error." (*Id.* at p. 1321.)

We similarly apply the fair argument test to review an agency's determination whether to prepare a new or supplemental EIR in a later new

44

project following certification of a program EIR. (*Sonoma, supra,* 6 Cal.App.4th at pp. 1319, 1320–1321.) The Legislature's use of similar language in sections 21151 and 21094 indicate "it intended to establish a similar low threshold for an agency's determination whether to prepare a new EIR on a later new project that follows certification of a program or plan EIR. In other words, if there is substantial evidence in the record that the later project may arguably have a significant adverse effect on the environment which was not examined in the prior program EIR, doubts must be resolved in favor of environmental review and the agency must prepare a new tiered EIR, notwithstanding the existence of contrary evidence." (*Sonoma,* at pp. 1319, 1320-1321.)

"[T]he legal standard that applies to whether an EIR meaningfully addresses an issue is the general standard for adequacy. [Citation.] The question is ' "whether [the] EIR's discussion of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating 'informed agency decisionmaking and informed public participation.' [Citation.]" ' " (*Ocean Street, supra*, 73 Cal.App.5th at p. 1004.) " 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such a manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' " (*Fresno, supra*, 6 Cal.5th at p. 511.)

### b. *Application*

The administrative record supports a fair argument that removal of the Coastal Zone height limit in the Midway-Pacific Highway Community Planning Area may arguably have significant adverse effects on the environment that were not examined in the PEIR.

Even though the City claimed in its 2020 consistency evaluation that the PEIR "included an analysis of the visual impacts on the implementation of the Midway-Pacific Highway CPU," the PEIR consistently said the CPU would have less than significant impacts on the visual effects and neighborhood character of the area because "new development within the community would take place *within the constraints of the existing urban framework and development pattern . . . .*" (Italics added.)  It also said there would be no substantial alteration in the bulk, scale, or style of the existing area because the PEIR stated the CPU "would encourage residential and mixed-use development that would be *consistent with and improve the existing neighborhood character.*" (Italics added.)  The PEIR analysis is limited in these areas *precisely because* it *did not* consider the impacts of buildings above the 30-foot height limit.  It did not consider environmental impacts on views, light and glare implications, and potential air quality issues associated with buildings over 30 feet.

Members of the public raised numerous concerns about the impacts of removing the height limit, allowing construction of large buildings above 30 feet, and the corresponding increase of density in the area.  These included impacts to traffic, human health, air quality, water quality, and greenhouse gas emissions.  Concerns about visual impacts included limiting views across the area and to Mission Hills and downtown.  Community members expressed concerns about the impacts high rise buildings have on the environment such as interrupting air flow and creating urban heat islands.  A member of Save Our Access commented, "the six communities in the Coastal Height Limit Zone are all important.  They're part of the coastal access for every San Diegan who wants to come west of I-5.  They're part of coastal air circulation.  They provide room to breathe, air circulation and

46

flight ways for birds." These concerns echo the reasons cited for implementation of the Coastal Zone Height Limit in 1972. Nevertheless, the City failed to consider these concerns and, instead, relied on the 2018 PEIR.

Even assuming, without deciding, that the PEIR considered certain environmental impacts of full "build out" of permitted residential densities as discussed earlier, the analysis primarily focused on traffic implications with related noise and air quality issues related to vehicular traffic. It is not apparent the analysis adequately considered all potential issues related to building heights above 30 feet.

Because the record supports a fair argument that there are potential unexamined environmental impacts related to the ballot measure to remove the Coastal Zone height limits in the Midway-Pacific Highway Community Planning Area, the City must conduct further analysis to comply with CEQA.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their fees and costs on appeal.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

47